Richard C. Delin, J.
The defendants, who stand accused of violating statutes against gambling, move this court for an order suppressing and excluding from evidence at trial any conversations to which they were a party and which were obtained by means of eavesdropping.
The stipulated facts upon which the defendants seek their relief, are as follows:
1. Three eavesdropping warrants were employed to obtain the evidence which is the subject matter of this motion. Court Orders #14-72, # 17-72, and #1-73. Each of these warrants and its accompanying application is in evidence.
2. The information received as a result of order #14-72 formed the basis of court order #17-72. The information received as a result of court order #17-72 formed the basis of court order #1-73.
3. The total calls (or conversations) intercepted under court order #14-72 was 1,209, categorized as follows:
(a) "Criminal” calls 792 (approximately 66%)
(b) "Non-criminal” calls 417.
The percentage of calls which were live-monitored is 85%. The number of "non-criminal” calls lasting more than two minutes is 48.
*347 4. The total calls intercepted under court order #17-72 was 4,032, categorized as follows:
(a) "Criminal” calls 3,707 (approximately 92%)
(b) "Non-criminal” calls 325.
The percentage of calls which were live-monitored is 50%. The number of "non-criminal” calls lasting more than two minutes is 10.
5. The total calls intercepted under court order #1-73 was 1,749, categorized as follows:
(a) "Criminal” calls 1,595 (approximately 91%)
(b) "Non-criminal” calls 154.
The percentage of calls which were live-monitored is 50%. The number of "non-criminal” calls lasting more than two minutes is 18.
6. When "non-criminal” calls were received, they were recorded, but the audio was turned off.
7. The warrants issued authorized 24-hour interception. The police officers only intercepted for approximately 12 hours a day: from approximately 11:00 A.M. to 11:00 p.m., which hours correspond to the operation of the day and night race tracks.
8. After each tape was received (and prior to sealing), it was brought to the District Attorney’s office, Vice Squad, and there kept under lock and key. The commanding officer and deputy commanding officer each had possession of a key.
9. The investigating detective could and did listen to portions of all tapes. When a "live” monitored tape was played, the police only listened to "criminal” calls. When "non-live” monitored tapes were played to ascertain which calls were "criminal”, the audio was turned off when a "non-criminal” call was ascertained.
10. As to the period between last interception and court sealing:
(a) The last recording under court order #14-72 was made on Wednesday, November 22, 1972, and sealing took place on Friday, December 1, 1972. The traditional Thanksgiving weekend occurred from November 23, 1972 (Thursday) to November 27, 1972 (Sunday).
(b) The last recording under court order #17-72 was made on Tuesday, January 30, 1973, and sealing took place on Friday, February 9, 1973.
(c) The last recording under court order #1-73 was made on *348 Wednesday, January 31, 1973, and sealing took place on Friday, February 9, 1973.
(d) Court orders #17-72 and #1-73 were brought to the Appellate Division, First Department, for sealing.
11. Court order #14-72 was mechanically executed in the Long Island Water Company’s sub-station, Roosevelt, New York. The Long Island Water Company is a privately-owned utility, and the police received permission for their action on its premises. Court orders #17-72 and #1-73 were mechanically executed in a public school at 148th Street, New York City, New York, with the permission of school authorities.
12. On the "return”, the court stated who should keep custody of the tapes without specifying how or where.
I.
This court has meticulously examined court orders #14-72, #17-72, and #1-73 and their accompanying applications, and finds each to be valid on its face and in conformity with the requirements of CPL art 700.
II.
One of the thrusts of this motion centers on the meaning of the word "immediately”, as found in CPL 700.50 (subd 2), which states: "Immediately upon the expiration of the period of an eavesdropping warrant, the recordings of communications made pursuant to subdivision three of section 700.35 must be made available to the issuing justice and sealed under his directions.”
Court order #14-72 expired on November 23, 1972, and court orders #17-72 and #1-73 expired on February 1, 1973. As to each of the three warrants, eight days passed from its expiration to the fulfillment of the sealing requirement.
The defendants contend that the word "immediately” must be given its ordinary dictionary definition of "without delay”, and seek suppression under this section solely by reason of delay in sealing. If they are correct in their position, then the relief they desire must be granted, for a failure to strictly comply with the "sealing” statute must result in suppression (People v Nicoletti, 34 NY2d 249). But it is a general rule that every provision of a statute must receive some consideration in determining the legislative intent to the use of words absolute in themselves (Wilson v Israel, 227 NY 423; Smith v *349 People, 47 NY 330; Cummings v Board of Educ. of City of New York, 275 App Div 577, affd 300 NY 611). Sections 700.55 through 700.65 of the CPL provide for duplicate recordings, and their use, and require the filing of detailed reports under Federal law; the sealing of the original tapes without any delay would render performance under those sections difficult, if not impossible. In addition, sound law enforcement procedure, as well as sensible pretrial discovery and orderly suppression hearings, require detailed inventories, duplicate tapes and transcripts, which necessarily delay the sealing of the original tapes.
The court construes the word "immediately” (within CPL 700.50, subd 2) to mean "without unnecessary or unreasonable delay”, and rejects the meaning ascribed to it by the defendants.
III.
Each of the eavesdropping warrants contained a provision that the interception should be directed only to conversations that related to designated offenses. The defendants seek suppression on the ground that the police violated the provisions of the warrants and their constitutional rights by failing to practice the minimization provision. (See Berger v New York, 388 US 41; Katz v United States, 389 US 347; United States v Tortorello, 480 F2d 764; United States v Scott, 331 F Supp 233.)
As to court orders #17-72 and #1-73, live-monitoring was employed with only 50% of the intercepted communications. The court finds that the manner of execution of these warrants violated their minimization provisions. But under these two warrants, less than 9% of 5,302 conversations were not "criminally” related, and of these only 28 lasted more than two minutes. That which minimization seeks to safeguard: the private, noncriminal conversation, is not a significant factor under these circumstances, and minimization becomes a moot issue as to these warrants.
As to court order #14-72, it is evident that good-faith attempts were made by the police to minimize their interceptions to "criminal” conversations. The court is aware that criminally-related conversations or transactions, especially those relating to policy, may initially sound innocent, and does not find disturbing the fact that 34% of the calls intercepted were not criminally related. It is reasonable to expect *350 the investigator to eavesdrop for a short time to ascertain the character of the conversation. The percentage of noncriminal calls lasting over two minutes is 4% of the total, which raises no issue of flagrant Fourth Amendment violations.
The other issues raised by the defendants have no merit.
Accordingly, the motion is granted to the extent that "noncriminal” conversations are excluded and suppressed from evidence at trial, and is otherwise denied.
It is, SO ORDERED.