**UNITED STATES of America**

v.

**Anthony RICCO, a/k/a "Tony Bragiole", Defendant.**

**No. 75 Cr. 411.**

United States District Court, S. D. New York.

Sept. 28, 1976.

---

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for the U. S.; Dominic F. Amorosa, Asst. U. S. Atty., of counsel.

Goldberger, Feldman & Breitbart, New York City, for defendant; Paul Goldberger, J. Jeffrey Weisenfeld, New York City, of counsel.

## MEMORANDUM

LASKER, District Judge.

■ Anthony Ricco seeks to suppress certain wiretap recordings and their transcriptions which the government proposes to introduce as evidence against him at his trial for alleged narcotics violations. Pursuant to 18 U.S.C. §§ 2516(2), 2518(8)(a) and N.Y. Crim.Proc.L. § 700.50(2), an evidentiary hearing was held August 31 and September 1, 1976, as to the reasons for delay in sealing the wiretaps.[1] We find that the delay was not excusable under New York law and

---

1. In New York this issue could be raised by objection at trial. See *People v. Sher,* 38 N.Y.2d 600, 381 N.Y.S.2d 843, 345 N.E.2d 314 (1976). The advantages of a pre-trial determination are obvious, however, especially where a hearing is required. The Second Circuit's rant is one of the very evils which sealing F.2d 502 (2d Cir. 1976), holding that 18 U.S.C.

§ 2518(8) furnishes a basis for suppression of wiretap evidence independent of the grounds stated in § 2518(10)(a) clearly indicates the propriety of pre-trial determination. Determining the question in advance of trial provides the additional advantage that the government may appeal an adverse decision thus eliminating the possible necessity of a second trial.

accordingly the wiretaps may not be introduced in evidence at trial.

On July 24, 1973, Justice Hughes of the New York Supreme Court, Westchester County, signed an order authorizing a wiretap of telephone numbers listed to V. O'Donnell. By its terms the order was to expire no later than August 22nd. On August 17th, on the basis of information derived from the O'Donnell tap, Judge John Cousins of the Westchester County Court signed an order authorizing wiretapping of Peter Mengrone's phone. This order was extended by Judge Cousins on September 18th and again on October 18th, each time on the basis of conversations intercepted during the preceding wiretap period.

Either late on October 23 or on October 24, 1973, the Mengrone wiretap was terminated, and Mengrone and several others allegedly involved in criminal activity with Mengrone were arrested. On November 5, 1973, Judge Cousins sealed[2] the box containing the original tape recordings of these wiretaps. There was thus a twelve or thirteen day hiatus between termination of the tap and sealing of the recording.

**2.** In view of our disposition of this motion on grounds of non-excusable delay, it is unnecessary to consider the adequacy of the sealing itself. For the purposes of this opinion it is assumed that the judge's action on November 5th fulfilled his obligations under the sealing requirements of state and federal law.

**3.** Even if it be assumed that Ricco had standing to assert the illegality of the O'Donnell taps as a basis for excluding the Mengrone taps, it is not clear that the latter taps would be excluded. On the one hand, *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) held that where an initial tap was sought by an Executive Assistant to the Attorney General (and was hence invalid under the statute requiring either the Attorney General or designated Assistant Attorney Generals to seek such orders) and an extension was sought by the Attorney General himself, not only was the first tap properly excluded but so was evidence from the second tap—since it was itself evidence resulting from the first, illegal tap. The court held that whenever a statutory requirement that was integral to the statutory plan for insuring judicial supervision of the wiretapping activities was violated, exclusion was required. In *United States v. Gigante, supra,* the Second Circuit held that the provisions for "sealing" were integral to the statute in the *Giordano*

## I.

Ricco argues first that the Mengrone tapes must be suppressed because they result from a previous wiretap (the O'Donnell tap) not conducted in accordance with statutory requirements. 18 U.S.C. § 2515. The government concedes that the O'Donnell tapes were not sealed in compliance with the statute, and that they provided the probable cause for issuance of the Mengrone authorization. However, the government argues, since Ricco was neither the subject of nor a party to the O'Donnell wiretaps, he therefore is not an "aggrieved person" with respect to the taps under the federal statute and thus, lacks standing to assert claims based on their illegality. The government is correct in its assertion that Ricco lacks standing[3] to dispute the authorization to conduct the Mengrone wiretaps on the grounds that the O'Donnell taps were illegal. See *United States v. Wright,* 524 F.2d 1100 (2d Cir. 1975); *United States v. Garcilaso de la Vega,* 489 F.2d 761 (2d Cir. 1974). No legally protected interest of Ricco's was injured by procedural defects in the O'Donnell wiretap, which provided am-

sense. Thus, it would seem that under this line of reasoning the Mengrone taps are the product of the earlier O'Donnell taps and would be excluded.

However, the wiretapping in *Giordano* was void *ab initio* because of improper authorization. One could argue that at the time the O'Donnell taps were used to establish probable cause for issuance of the Mengrone taps, they were not illegal—since the record appears to establish that the Mengrone taps were issued before or just as the O'Donnell taps terminated and hence still within a reasonable period of "immediacy." Subsequent failure to seal the O'Donnell taps in no way "infected" their use to establish probable cause for the Mengrone taps. Thus, it can be argued that the Mengrone taps were not the result of an illegal original tap, since the original tap was not illegal at the time it led to the Mengrone tap. (The absence of a seal at the time of the probable cause determination may be analogized to reliance on hearsay to establish probable cause even though it would not be competent or admissible evidence on guilt or innocence at the trial. See, e. g., *United States v. Simpson,* 353 F.2d 530 (2d Cir. 1965), *cert. denied,* 383 U.S. 971, 86 S.Ct. 1281, 16 L.Ed.2d 311 (1966).)

ple probable cause for issuance of the Mengrone authorization.

## II.

■ The government concedes that Ricco has standing to seek suppression of his own conversations on the Mengrone tapes, but argues that he lacks standing to suppress any conversations in which he did not participate because of the "prohibition against assertion of another's rights" articulated in cases involving Fourth Amendment or analogous interests. *United States v. Scott,* 164 U.S.App.D.C. 125, 504 F.2d 194, 197 n.5 (D.C.Cir. 1974).[4] Our view is that Ricco's standing with respect to these tapes is much broader, and that if the Mengrone tapes were not sealed in accordance with statutory requirements, all of them must be suppressed as to Ricco. The limited standing rules relevant where evidence is claimed to be excludable because procured in violation of the Fourth Amendment derive from the purpose of that exclusion: deterrence of police misconduct which violates individual privacy rights secured by the Fourth Amendment. *Alderman v. United States,* 394 U.S. 165, 171–76, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *United States v. Tortorello,* 533 F.2d 809 (2d Cir. 1976). No truth or reliability interests are promoted by this "exclusionary rule;" frequently, otherwise competent and probative evidence is excluded merely because it was procured in an unlawful manner.[5]

■ These rules of standing are inapposite in the present circumstances. Ricco does not complain that the government unreasonably seized Mengrone's conversations, but that inadequacies in the sealing procedure cast doubt on the integrity of the evidence. Any litigant has "standing" to challenge the reliability of evidence to be presented against him or her at trial. Both the United States Court of Appeals for the Second Circuit and the New York Court of Appeals have treated the sealing requirement as one going to the integrity of the tapes and affecting their admissibility into evidence.[6] *United States v. Gigante,* 538 F.2d 502, 506 (2d Cir. 1976); *People v. Nicoletti,* 34 N.Y.2d 249, 356 N.Y.S.2d 855, 313 N.E.2d 336 (1974). In other words, the sealing requirement proscribes certain governmental conduct in order to enhance the reliability of evidence, rather than to prevent unreasonable searches and seizures. Ricco's interest in suppressing these tapes is therefore within the zone of interests which the sealing requirement seeks to protect, *Association of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 152–57, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); and Ricco may be injured just as much by the jury's hearing or viewing inaccurate reproductions of conversations about him as by inaccurate reproductions of his own conversations.

---

4. The cases cited by the government in support of its view that Ricco has standing to suppress only his conversations on the Mengrone tape are inapposite. See, e. g., *United States v. Poeta,* 455 F.2d 117, 122 (2d Cir.), *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972); *United States v. Scott,* 164 U.S.App. D.C. 125, 504 F.2d 194, 197 n.5 (1974). These cases hold that a defendant may not assert failure to minimize interception of third parties' conversations as a basis for excluding those conversations from use against him at trial. The minimization requirement, however, is designed to protect Fourth Amendment privacy interests, which are personal to the parties whose rights are invaded. Traditional Fourth Amendment law forbids the assertion of third parties' rights to exclude evidence against oneself. No question of *reliability* or admissibility of evidence in the traditional sense is involved in the minimization cases.

5. Indeed, the concept of an "exclusionary rule" implies, in a semantic sense, that the evidence sought to be "excluded" could be "admitted"— if it could not be "admitted" there would be no reason to "exclude" it since it would be "inadmissible" anyway.

6. Defense counsel informs us that in *Gigante,* although the tapes were suppressed as to all the defendants, some of the defendants were not heard on the tapes and were not the "subjects" of the eavesdropping. If correct, the clear implication of this, and of *People v. Sher,* 38 N.Y.2d 600, 381 N.Y.S.2d 843, 345 N.E.2d 314 (1976), is that the sealing requirement is one whose absence may be relied on by *any* defendant to prevent the admission of incompetent evidence.

Thus, upon timely objection wiretap evidence which has been improperly sealed must be excluded from the trial[7] of *any person* just as an improperly certified document would be excluded, i. e., held inadmissible.

### III.

The question then, is whether the Mengrone tapes (or any transcriptions or recordings made from them) are admissible at Ricco's trial.

The government argues that since the second extension order, signed on October 18th, authorized the wiretap to continue until November 17th, and since the tapes were sealed on November 5th, they were sealed "12 days before the expiration of the period of the third eavesdropping warrant . . . [and] were then sealed . . . well within the requisite time period." We disagree.

On page 3 of Judge Cousin's third eavesdropping order, in effect at the time the tap itself was terminated, it is ordered that:

> "the authorized eavesdropping shall not terminate upon the initial seizure of certain conversations but shall be in force and effect until the seizure of sufficient evidence to justify the arrest of the principals in this criminal conspiracy which is being investigated and the identity of the co-conspirators and the extent of the conspiracy is determined . . . ."

Immediately following this paragraph, the Court ordered that:

> "the relief granted herein is to take effect on the 19th day of October . . . and shall be in full force and effect twenty-four hours per day for thirty days up to and including the 17th day of November 1973, or until the seizure of the aforementioned evidence, whichever shall occur first . . . ."

■ The relief sought before and granted by Judge Cousins was an extension of the initial wiretap order. These paragraphs clearly state that the extension was to be in effect only until November 17th *or such earlier time as the police had gathered sufficient evidence to make the necessary arrests.* That earlier time had arrived on October 24th, when the tap was terminated and arrests were made. The New York statute (like the federal counterpart) provides that "Immediately upon the expiration of the period of an eavesdropping warrant . . . ." the tapes shall be made available to a judge for sealing. N.Y.Crim. Proc.L. § 700.50(2). In this case, the "expiration of the period of an eavesdropping warrant" occurred, by application of the terms of the order, on October 24th.

The judge's order requiring termination of the tap upon gathering enough evidence was in turn required by the New York statute. N.Y.Crim.Proc.L. § 700.30 states that every eavesdropping warrant must contain "[a] provision that the authorization to intercept . . . must terminate upon attainment of the authorized objective, or in any event in thirty days." An argument could be made that "the period of an eavesdropping warrant" mentioned in § 700.50 refers to the maximum time period stated in the order, whereas the "authorization to intercept" is distinct from the "period" of the warrant and refers to the authorization as stated in the order. The language of the second paragraph on page 4 of Judge Cousin's order, quoted *infra* at page 410, might support such a distinction.

■ The fundamental objection to this reading of the statute, however, is that it is inconsistent with the purpose of the sealing requirement. That purpose is to place the custody and disposition of evidence obtained through the taps as much as possible under the control and supervision of the court, thereby avoiding the potential for tamper-

---

7. The discussion in Part I, *supra,* and in notes 3 and 4 was not directed to the question of the admissibility of the O'Donnell tapes at Ricco's *trial.* It is unnecessary to decide this question since the government has stated that it will not seek to use those tapes at Ricco's trial. How- ever, if we are correct that the sealing requirement goes to the competency and admissibility of the evidence in the traditional evidentiary sense of insuring reliability, then the O'Donnell tapes would be inadmissible at Ricco's trial just as much as the Mengrone tapes.

ing or for inadvertent abuse of the evidence. *United States v. Gigante, supra.* This being the purpose it would not be rational to require the "immediate" sealing of wiretaps when the investigation continues up to the last day of a thirty-day order, but to permit sealing to be postponed until the end of the thirty-day period where the wiretap investigation itself terminates on, say, the second or third day of the thirty-day period. Under the government's view, in the latter instance the police could retain the tapes for 28 or 29 days beyond the dates that the wiretap was terminated. That is hardly consistent with the purpose described above, particularly since transcription and duplication may be performed more rapidly on two or three days worth of taps than on thirty days worth, thereby rendering the "immediate sealing" requirement even as interpreted here less onerous in the former than in the latter case.

In any event, this statutory argument was not made to the court, and a more sensible approach to the statute as a whole is to say that the period of an eavesdropping warrant expires *either* at the expiration of the time period specified in the warrant or upon achieving the objective of the investigation, whichever occurs first;[8] and that upon occurrence of this event, the tapes must immediately be made available to the court and sealed.

## IV.

In *United States v. Gigante, supra,* the Court of Appeals held that an unexplained failure to seal wiretaps procured under federal warrants for periods ranging upwards of eight months after termination of the

taps required the suppression of those taps and evidence derived therefrom at trial; a delay in sealing had to be satisfactorily explained just as the complete absence of a seal did, as a "predicate for the use" of the evidence under the federal wiretap statute. The Court emphasized the structural integrity of the immediate sealing requirement to the statutory scheme of the wiretap statute, designed to avoid abuses resulting from electronic eavesdropping, and in particular, to assure the reliability of wiretap evidence by reducing the opportunities for deliberate tampering or inadvertent modification of wiretap evidence. *Id.,* 538 F.2d at 505. After affirming the district court's suppression of six tapes sealed 8 to 12 months after termination, the Court of Appeals remanded to determine whether a 13-day delay in one instance had or had not been excusable.[9] The Court did not provide any guidance as to what constitutes a valid excuse or "satisfactory explanation."

█ The New York courts have explored this question in some detail. When the government seeks to use wiretaps authorized under state law—as here—it is, of course, bound by the state requirements which may be more stringent than those imposed under the federal statute alone. *United States v. Manfredi,* 488 F.2d 588 (2d Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *United States v. Poeta,* 455 F.2d 117 (2d Cir.) *cert. denied,* 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972); 18 U.S.C. § 2516. In this case, whatever "immediately" or a "satisfactory explanation" for the absence or delay of sealing may mean as a matter of federal law,[10] the sealing requirement does

---

**8.** We have assumed a situation in which the issuing court eliminated the otherwise automatic termination-upon-first-interception provisions of state and federal law. 18 U.S.C. § 2518(1)(d), (4)(e); N.Y.Crim.Proc.L. § 700.-30(6).

**9.** The first wiretap in *Gigante* had been authorized by then District Judge Gurfein in November of 1972 and had expired on November 24th. The tapes were sealed *"some time"* in December, the exact date being impossible to determine. The government claimed that an extension of the original order granted on December

8, 1972, postponed the sealing requirement for the tap ended November 24th. The court remanded for a determination of (1) whether the December 8th order was an effective extension of the earlier order for purposes of the sealing requirement, and (2) if it were, whether the 13 day delay in seeking the extension was excusable.

**10.** In *United States v. Capra,* 501 F.2d 267, 277 n.10 (2d Cir. 1974) *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975) the court stated without explanation or reasoning that as a matter of New York and federal law, tapes

not appear to have been met under New York law.

Although the hearing in this case was held almost three years after the events in question and witnesses' recollections were understandably somewhat inconsistent, we have concluded the following (based primarily on the testimony of Police Officer John Burns, who conducted the Mengrone wiretap investigation): During the initial stages of that investigation, two recording machines were in use and were making duplicate original recordings. Due to the volume of calls, however, the second machine at some point came to be used for transcription purposes only. Thus, only one original tape was made during the later weeks of the investigation.

When the tap was terminated on October 23rd or 24th, there were still some 20 conversations on one tape reel to be transcribed. Officer Burns testified that the transcription of one reel could take two to three days. However, on October 24th and 25th, Officer Burns was engaged in the discovery and arrest of one of the coconspirators and thus could not work on the transcription; he apparently did not delegate this task to anyone else. On October 26th, he enjoyed (we hope) a well-earned day of rest. Sometime between the 27th and November 5th, under Officer Burns' supervision, transcription of the tapes was completed.

Although the need to make transcriptions is beyond dispute, there is no explanation why it took over a week to transcribe 20 or so conversations. More important, it is difficult to understand why a duplicate of the tapes was not made as soon as Officer Burns returned to work on the tapes on October 27th. Although Burns testified that no "fast" duplicator was available in the Bronx, on November 5th, before bringing the tapes to Judge Cousins for sealing, Burns took the entire set of tapes to the Federal Building in lower Manhattan and, using a "fast" duplicator there, reproduced the entire set in less than three hours. This machine was apparently available to the police in the Bronx throughout the time period after the taps terminated.

Officer Burns did say that transcription from the originals was preferable because their sound quality was better. However, in *People v. Nicoletti*, 34 N.Y.2d 249, 356 N.Y.S.2d 855, 313 N.E.2d 336 (1974), the New York Court of Appeals has indicated that especially for transcription purposes, a *duplicate* recording should be used to avoid damage to the original. There, apparently with the approval of the issuing justice, who was aware of the existing custody arrangements, no seal had ever been placed on the tapes. The state argued that it had been necessary to avoid sealing the tapes so that transcription and analysis could be done from the originals. The Court of Appeals, reversing a conviction resulting from trial in which unsealed tapes had been admitted, wrote:

"That the issuing Justice was advised of the custody arrangements will not suffice . . . . We have no quarrel with the

need not be suppressed where they were not immediately sealed since no prejudice from the delay was shown. *Gigante* rejected the government's claim that absence of prejudice excuses delay and recent New York cases have not required proof of prejudice. *Capra,* therefore, is not controlling.

Only two circuits other than our own appear to have ruled in relevant fashion on related questions. The Third Circuit's holding in this area was expressly disapproved by the Court in *Gigante. United States v. Falcone,* 505 F.2d 478 (3d Cir. 1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975) (45 day delay not in itself sufficient to suppress evidence).

In *United States v. Sklaroff,* 506 F.2d 837 (5th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975) the Fifth Circuit found the requirements of § 2518(8) satisfied where a 14-day delay in procuring "sealing" had been "accounted" for by the information that for seven days the tapes were locked up in FBI headquarters, and for the next week they were being used in the preparation of search warrants. This decision seems clearly contrary to New York law on the subject, see *infra,* p. 408, which must be applied in this case. *United States v. Manfredi,* 488 F.2d 588 (2d Cir. 1973). Moreover, in the instant case the tapes' whereabouts have not been thoroughly "accounted for." See *infra,* p. 410.

contention that the recordings were needed for transcription and analysis and that in a conspiracy and gambling investigation this is a particularly arduous task. But for these purposes duplicate recordings could and should have been made and the originals preserved under seal . . . Particularly where, as here, the recordings must be played and re-recorded many times for the purposes of transcription and preparation of composite recordings, there is the possibility for human or mechanical error, the erasure of portions of the tapes, and the destruction of evidence. Questions of potential tampering aside [there were no allegations of such], prudence alone dictates that such tasks be done with duplicate not original recordings." 34 N.Y.2d at 253–54, 356 N.Y.S.2d at 858, 313 N.E.2d at 339.

In the light of the foregoing, the one lower court [11] New York case which appears to support the government's position here seems plainly incorrect. In *People v. Carter*, 81 Misc.2d 345, 365 N.Y.S.2d 964 (Nassau Co. Ct., Pt. I, 1975) a sealing delayed eight days after the tap terminated was found to satisfy the "immediacy" requirement where claimed to have been necessary in order to prepare duplicate tapes, make transcriptions and conduct inventories. However, the New York Court of Appeals,

in *Nicoletti*, makes it clear that sealing of the original tapes may not excusably be delayed in order to make transcriptions.[12]

*People v. Simmons*, 84 Misc.2d 749, 378 N.Y.S.2d 263 (Sup.Ct. N.Y.Co. 1975) discusses *Nicoletti* at length and is more consistent with the reasoning of the Court of Appeals than is *Carter*. There the court held that a delay of 21 days between termination of the taps and sealing was not satisfactorily explained and did not meet the immediacy requirement even though the State sought to justify it by the need to make duplicate recordings, transcriptions, and inventories, by the pendency of other related proceedings, and by the mistaken belief that the statute required all reports to be made to the judge at the time of sealing. The lower court reiterated the *Nicoletti* view that duplicate recordings should preferably be made during the tap. In agreement with *Gigante*, it held that an unsatisfactorily explained delay in sealing was equivalent to an unexplained absence of seal, and suppressed the tapes.[13]

Similarly, in *People v. Guenther*, 81 Misc.2d 258, 366 N.Y.S.2d 306 (City Ct. Monroe Ct. 1975) a motion to suppress wiretaps was granted where, in violation of departmental rules police officers kept the tapes in their lockers for 7 days after the

---

**11.** In *People v. Blanda*, 80 Misc.2d 79, 362 N.Y.S.2d 735, (Sup.Ct. Monroe Co. 1974), the court held that a three-day delay in sealing the tapes—from Friday to Monday—had been satisfactorily explained where the officer had tried to reach the judge on Friday, and had been off-duty Saturday and Sunday. This decision seems correct under any reasonable view of what "immediately" means in this context.

**12.** Even if *Carter* were correct New York law, we note that in the *instant* case a somewhat longer period of delay was involved, no inventory of tapes was ever made by the police or District Attorney, and the duplication of the tapes took only three hours.

**13.** *Simmons* also held that the sealing requirement under the New York statute arose at the end of each separate wiretap order or extension; in other words, each tape had to be sealed, at the latest, at the end of each 30-day period. The judge based his reasoning on a difference in the language of the federal and

New York statutes, noting that his interpretation was in accord with the policy of insuring prompt sealing under judicial supervision. Defendant argues from this decision that we are really dealing here with three different delay periods for three different sets of tapes: a period of some 49 days for tapes made between August 17th and September 18th; of 17 days for the period between September 19th and October 18th; and a period of 12 days for tapes made between October 18th and October 23rd. We are hesitant to adopt the *Simmons* holding as the law of New York since it is unique and has not yet been reviewed by the Appellate Division, much less the Court of Appeals. However, even if it is a correct statement of New York law, the "delay" attributable to the officers' and judge's reliance on the interpretation accorded this problem under the federal statute appears to be excusable under the reasoning of *United States v. Poeta, supra,* 455 F.2d at 122.

taps terminated before bringing them to the judge for sealing. Although the officers had duplicated the tapes ("which took a few hours") and had not believed the judge would be available over a long holiday weekend, the Court held:

"This is not conduct pursuant to the statute requiring immediacy, nor is it a satisfactory explanation of delay in accordance with *People v. Poeta, supra,* nor within the spirit of *People v. Nicoletti, supra.*" 366 N.Y.S.2d at 309.

Although the record clearly establishes that Officer Burns worked with exceptional and praiseworthy diligence and success on this important investigation, it is nevertheless apparent that the police and the District Attorney took more time than was necessary to prepare the tapes for sealing. The word "immediately" must be interpreted reasonably; of course, it does not require instantaneous action. See *People v. Blanda,* 80 Misc.2d 79, 362 N.Y.S.2d 735 (Sup.Ct. Monroe Co. 1974). What it does mean is that law enforcement officers must be provided reasonable resources which must be used with reasonable dispatch to the end that the tapes are sealed as soon after the taps end as is possible in such circumstances. That standard was not met.

The government argues that even if the delay is not satisfactorily explained by the need to make transcriptions and duplicate tapes, it is nonetheless excusable under *United States v. Poeta, supra,* as resulting from the state officers' reasonable mistaken belief of what the law required. It is true that in 1973 the statute was still relatively new. A witness from the Westchester District Attorney's office suggested that any delay in sealing attributable to that office resulted from a belief that all the tapes had to be sealed at the same time, and the belief that Judge Cousins had afforded 14 days from the expiration of the tap in which to make the tapes available to him for sealing. There is no support in either the statute or

the order for these beliefs. The court's order expressly provides that:

". . . immediately upon the expiration of the Order, the recordings of intercepted communications shall be made available to this court, and within fourteen days of the termination of the interception of communications as hereinbefore authorized, the District Attorney . . . shall file a sworn return . ."

containing a summary of the conversations overheard. Thus, even under *United States v. Poeta, supra,* these reasons do not appear to constitute a "satisfactory explanation." There, the court held that under the New York statute a thirteen day delay in sealing had been satisfactorily explained by the officer's belief that only the issuing justice (at the time away on vacation) could seal the tapes. The statute had, indeed, provided that "the issuing justice" should seal the tapes. Here, whatever confusion may have existed as to the time for sealing resulted not from the statute but was in the minds of the officers in charge. And under New York law, even the acquiescence or approval of the issuing judge in avoidance or delay of sealing has been held not to excuse a failure to seal or to seal "immediately." *People v. Nicoletti, supra; People v. Simmons, supra,* 378 N.Y.S.2d at 266.

■ The importance of the sealing requirement is emphasized by one other aspect of this case. In addition to its purpose of insuring reliability by preventing alterations, the New York courts have found a second purpose to the sealing requirement: clarification of the chain of custody. *People v. Nicoletti, supra,* 34 N.Y.2d at 253, 356 N.Y.S.2d 855, 313 N.E.2d 336. In this case it proved impossible to reconcile the chain of custody as described by the New York police officer on the one hand and the Westchester County District Attorney on the other.[14] Although we have credited the testimony of the police officer, even his testimony showed only that the boxes were

---

14. Assistant District Attorney Dalen's testimony basically was that the original tapes were brought up to his office in Westchester every few days throughout the tap period; that they

had all been delivered to his office within five days of October 24th; and that they had been taken from his office to Judge Cousin's chambers for sealing on November 5th.

stored during this period in one of two possible places at unknown times. The *potential* for abuse in these circumstances is the very evil which the sealing requirement was designed to avoid, *People v. Nicoletti, supra; People v. Simmons, supra; United States v. Gigante, supra.* When the reliability and integrity of tapes is open to doubt, questions of guilt or innocence may be affected.

Because the tapes were not immediately sealed, and because the delay of nearly two weeks has not been satisfactorily explained, the Mengrone tapes must be suppressed.

### V.

Defendant's motion to suppress the testimony of Mengrone, on the grounds that it will be tainted by his having refreshed his memory from these tapes, is denied. Defendant asserts that Mengrone was shown transcripts of the tapes prior to his testifying in an earlier proceeding, and that this view tainted his testimony and would continue to do so. Mengrone's testimony is desired at trial to prove actual conversations which allegedly occurred and of which he has firsthand knowledge. Any "taint" resulting from Mengrone's look at these tapes can be brought out by the defendant on cross examination of the witness; if his testimony is inconsistent with what the tapes show, it can be impeached by prior inconsistent statements on the tapes, and even if his testimony is fully in accordance with the tapes, his independent recollection and/or credibility can be impugned by establishing his opportunity to study the tapes.

Accordingly, defendant's motion to suppress the Mengrone tapes at trial is granted, and the motion to suppress the testimony of Peter Mengrone as a witness at trial is denied.

It is so ordered.