UNITED STATES of America,

v.

**Michael LILLA, Mark Lilla, Robert Lilla, Douglas Pintka a/k/a "Dougan", Raymond C. Colehamer a/k/a "Charlie", Christopher Burch, Robert Moffre, Peter Santos a/k/a "Pete", Louis Ferraro, David Hine, Richard Strack, Michael Bouck and Frank Benson.**

UNITED STATES of America

v.

**Mark LILLA, Robert Lilla and Everett Garnsey.**

UNITED STATES of America

v.

**Donald BENSON.**

Nos. 81–CR–53 to 81–CR–55.

United States District Court,
N. D. New York.

March 12, 1982.

As Amended March 15, 1982.

---

George H. Lowe, U. S. Atty., N. D. N. Y., Albany, N. Y., for plaintiff; George A. Yanthis, Asst. U. S. Atty., Albany, N. Y., of counsel.

George J. Camino, Schenectady, N. Y., for defendant Michael Lilla; Guido A. Loyola, Schenectady, N. Y., of counsel.

O'Connell & Aronowitz, P. C., Albany, N. Y., for defendant Mark Lilla; Stephen R. Coffey, Albany, N. Y., of counsel.

Parisi, Delorenzo, Gordon, Pasquareiello & Weiskopf, P. C., Schenectady, N. Y., for defendant Robert Lilla; John R. Massaroni, Schenectady, N. Y., of counsel.

Elena C. Vaida, Albany, N. Y., for defendant Douglas Pintka.

E. Stewart Jones, Jr., Troy, N. Y., for defendant Raymond Colehammer.

William J. Gray, Albany, N. Y., for defendant Christopher Burch; Laurie B. Kurtzman, Albany, N. Y., of counsel.

McDermott & Cheeseman, Albany, N. Y., for defendant Richard Strack; Paul E. Cheeseman, Albany, N. Y., of counsel.

Higgins, Roberts, Beyerl & Coan, P. C., Schenectady, N. Y., for defendant Michael Bouck.

Jerome K. Frost, Troy, N. Y., for defendants Frank Benson and Donald Benson.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

The defendants have been indicted for allegedly violating various federal laws concerning the trafficking of cocaine and marijuana. Following their arraignments, the defendants moved to suppress certain evidence derived from several wiretaps which had been authorized by New York State judges pursuant to New York law and which had been monitored by the New York State Police. The grounds asserted in these motions pertain to the issuance, extension, and execution of the wiretaps, and to various post-interception matters concerning the same. In addition to challenging the electronic surveillance, two defendants moved to suppress statements which they had made to law enforcement officers following their arrests. This Court duly presided over a suppression hearing with respect to both sets of motions, and also conducted an *in camera* proceeding in regard to a confidential informant.

Based upon the evidence adduced at the hearing, and upon the papers and arguments presented by the parties, this Court now concludes that the motions to suppress the wiretap evidence should be denied, and that the motions to suppress certain statements should be granted.

## I. ELECTRONIC EAVESDROPPING

Before addressing the arguments regarding electronic surveillance, it is necessary to consider the choice of law problems presented here. The issue concerns the extent to which New York, or federal, law governs the admissibility in this federal prosecution of evidence derived from the State wiretaps.

The Second Circuit has explored this question on numerous occasions. *See, e.g., United States v. Vasquez*, 605 F.2d 1269, 1280 n.26 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979); *United States v. Sotomayor*, 592 F.2d 1219, 1224–26 (2d Cir. 1979); *United States v. Fury*, 554 F.2d 522, 525 n.3 (2d Cir. 1977), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978); *United States v. Hinton*, 543 F.2d 1002, 1011 (2d Cir.), *cert. denied sub nom.*, 429 U.S. 980, 1051, 1066, 97 S.Ct. 493, 796, 50 L.Ed.2d 589, 783 (1976), 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977); *United States v. Marion*, 535 F.2d 697, 702 (2d Cir. 1976); *United States v. Manfredi*, 488 F.2d 588, 598 (2d Cir. 1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974). *See also* S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, 2112, at 2187. What emerges from these cases is the requirement that, to be controlling, State wiretap guidelines must, at the very least, be as stringent as the requirements of federal law, which are contained in Title III

of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20, and in the Fourth Amendment to the Constitution of the United States. Thus, initially, the contested wiretaps must be measured against both federal and State law. Where, however, State standards are more stringent than federal law, a federal court is obliged to apply only those requirements of State law that are intended to protect a person's right of privacy. These requirements include conditions for the issuance and execution of eavesdropping warrants. A federal court does not apply those more stringent State laws that govern primarily evidentiary matters or the preservation of evidence after interception, such as the sealing of tapes. Finally, where State law governs, a federal court may look to federal law for guidance if State statutory and decisional law supply inadequate information on a particular issue.

With these principles in mind, the Court shall now turn to the objections raised by the defendants.

### A. *Issuance of the Initial Warrants*

The defendants have made a number of arguments directed at whether two eavesdropping warrants were properly issued. In regard to these claims, the following facts have been presented to this Court.

On April 23, 1980, the District Attorney of Schenectady County applied to the New York Supreme Court, Schenectady County, for an eavesdropping warrant to investigate violations by Michael Lilla, and others, of New York Penal Law §§ 105.10 (Conspiracy, Second Degree), 221.55 (Criminal Sale of Marijuana, First Degree). Accompanying his application was an affidavit by New York State Trooper Kenneth T. Cook, dated April 23, 1980. Trooper Cook, who was assigned to a narcotics unit at Troop G, stated in his affidavit that he had initiated an investigation into narcotics trafficking by Michael Lilla, who worked at Unified Auto and Equipment, Inc., or Better Body Works, in Schenectady, New York, and who resided in Rexford, New York. In April, 1980, Cook stated, he received information

from a confidential informant to the effect that Lilla was selling illegal drugs, including cocaine and marijuana, and that Lilla used the telephones at his place of employment and at his residence to arrange with other persons the sale of these drugs. Additionally, the informant told Cook that he could make arrangements with Lilla over the telephone to purchase drugs. Thereafter, on April 10, 1980, the confidential informant came to Cook's office to telephone Lilla and buy illicit drugs. With the permission of the informant, Cook, using an extension telephone, dialed the telephone listing for Unified Auto, and subsequently overheard a conversation in code between the informant and a person whom the informant identified as Michael Lilla. During the course of the conversation, a person who responded to the name "Mike" said that although "Flake" was unavailable at that time, someone was going to bring some up in a week or two, and that he could meanwhile sell the informant "Lumbo." In this context, "Mike" also mentioned that "we" had "all kinds of people" who owed "us" money for "Flake." "Mike" then asked the informant to come to his place of business that day, for the apparent purpose of purchasing "Lumbo." "Mike" stated further that if he was not at work when the informant came to make the purchase, the informant could call him at home. The conversation, a tape of which this Court heard *in camera*, then ended. Interpreting the code used by the parties, Cook, relying upon his experience and training as a narcotics investigator, stated in his affidavit that "Flake" signified cocaine and that "Lumbo" denoted marijuana.

Following this conversation, Cook averred in his affidavit, the informant and Cook, in an undercover capacity, proceeded later that day to Unified Auto, where Cook purchased a pound of marijuana from a person who identified himself as Mike Lilla, and discussed with him the possibility of purchasing cocaine. Lilla informed Cook that cocaine would be available in a week or two and that his brother was in Florida arranging for the acquisition of "coke" and "grass." He also advised Cook to telephone

him at Unified Auto or at his home to discuss the purchase of additional drugs.

Relying upon these contacts with Michael Lilla, Cook set forth in the affidavit his belief that his investigation of illicit drug trafficking apparently involved persons other than Michael Lilla, and that wiretapping was the "[only] investigative method . . . to determine the identity of these other persons" and to gather "evidence of their guilt." Cook went on to state, based upon his experience, that it is common for persons engaged in narcotics trafficking to conduct their business on the telephone at irregular hours during the day and night and through the use of code. Furthermore, Cook expressed his opinion that although probable cause existed for the issuance of an arrest or search warrant, it would be better to monitor conversations and determine the identity of other participants in the conspiracy.

Based upon the District Attorney's application and Cook's supporting affidavit, Supreme Court Justice Dominick J. Viscardi issued an eavesdropping warrant for the seizure of conversations of Michael Lilla and other involved persons on a telephone number listed to Unified Auto and on a telephone number listed to Adrian Lilla, Michael Lilla's father, with whom Michael Lilla resided in Rexford, New York. According to the warrant, the Justice found reasonable cause to believe that certain conversations either would constitute evidence of the crimes of possession and sale of cocaine, possession and sale of marijuana, and conspiracy and attempt to do the same, in violation of N.Y.Penal Law, Articles 220, 221, 110 and 105, or would aid in the apprehension of persons engaged in such criminal acts. Additionally, the Justice found that normal investigative procedures had been tried, but had failed to obtain evidence of these crimes. For these reasons, the warrant indicates, the Justice authorized the eavesdropping of all conversations pertaining to these crimes and concerning the buying, selling, delivery, transfer, and possession of such unlawful substances, and details relating to these crimes, including the conversations of other persons whose identi-

ties were then unknown, but whose conversations would be evidence, or lead to evidence, of their participation in the crimes. Also, in the warrant the Justice admonished law enforcement officers to minimize the interception of conversations not subject to seizure, and furthermore, to restrict seizures to any established pattern of operations. Finally, the Justice directed that all eavesdropping would cease on the 30th day following the date of the issuance of the warrant, viz., on May 24, 1980.

Apart from this warrant, law enforcement officers also secured a second eavesdropping warrant.

On May 8, 1980, the District Attorney of Saratoga County applied to the New York State County Court of Saratoga County for an eavesdropping warrant to investigate a person identified as "Doug" and other individuals who were suspected of violating N.Y.Penal Law Articles 220, 105 and 110 concerning the possession and sale of controlled substances and the conspiracy and attempt to do the same. The warrant application affected the residence telephone of Robert Lilla, who lived in Burnt Hills, New York. Accompanying the application was an affidavit by New York State Police Narcotics Investigator Edmund W. Girtler, Jr., dated May 8, 1980. In his affidavit Girtler, who was assigned to Troop G, averred that he had listened to drug-related conversations, in code, seized from a telephone listed to Unified Auto. For example, Girtler stated, on April 28, 1980, a person identified as Robert Lilla received a telephone call from "Everett"; "pharmaceutical" was mentioned in the conversation. Also on April 28, Robert Lilla received a call from "Joe," who asked for "Doug"; Lilla told "Joe" that "Doug" was sleeping, and that "Joe" should call "Doug" at Robert's residence. Subsequent to this call from "Joe", Robert Lilla, or "Bob", was telephoned by "Doug"; the parties mentioned that "Charlie" would be coming over that night "to the house" to get "some stuff," and discussed the availability of "some green". Next, on May 3, 1980, Robert Lilla received another call from "Doug"; Robert told "Doug" that he

intended to talk to "Charlie" and ascertain whether "Charlie" was interested in buying the "car", "snow tires", and "stuff". That same day, Robert was contacted by "Frank"; Robert told "Frank" that he had someone who wanted to buy a "car", and that he had only one "lot" left, and asked "Frank" if his "guy" wanted a "first crack at it." Later on May 3, Robert telephoned his residence, and talked to "Doug"; Robert told "Doug" that someone was interested in the "car". In this same conversation were the phrases "convertible", "the whole roof", "the hard top and the soft top", "this other car dealer", "breakdown", "adding the additives to it", "stereo", "radio", and "FM with complete control."

Relying upon his experience as a narcotics investigator, Girtler stated in affidavit that, in drug vernacular, "pharmaceutical" means cocaine. Additionally, the investigator averred, based upon conversations seized over the telephone held by Unified Auto, "car" and "snow tires" pertained to cocaine; "convertible" and "soft top" signified fine cocaine powder; "hard top" denoted rock or crystalized forms of cocaine; and "additives" referred to agents used to prepare or cut cocaine.

In his affidavit, Girtler further recited that he and other investigators had attempted to conduct spot checks of Robert Lilla's residence, but without success; a fixed surveillance of the location, a densely populated area, according to Girtler, could be easily detected, and could jeopardize the investigation. Moreover, Girtler stated that he and other investigators had unsuccessfully attempted to gather information regarding narcotics trafficking at Lilla's residence by physical surveillance and by contacting informants. The investigator went on to express his opinion that other unknown co-conspirators were involved in drug trafficking, and that wiretapping was the only investigative method to determine the identity of such persons and to acquire evidence of their guilt. Finally, Girtler indicated that it is a common practice of persons dealing in unlawful drugs to conduct business on the telephone only with persons known to them and at irregular

hours of the day and nights, and that although probable cause existed for the issuance of a search warrant for the residence of Robert Lilla, such action would destroy any opportunity of acquiring evidence of other criminal activity.

Based upon the District Attorney's application, and upon the supporting affidavit of Investigator Girtler, Saratoga County Court Judge Loren N. Brown issued an eavesdropping warrant on May 8, 1980, authorizing the interception of conversations of "Doug" and other persons on a telephone number listed to Robert Lilla, Burnt Hills, New York. In the warrant, the Judge expressed his conclusion that there was reasonable cause to believe that "Doug" and other persons were committing crimes of criminal possession and sale of controlled substances, and of conspiracy and attempt to do the same, in violation of N.Y.Penal Law Articles 220, 110, and 105. Finding further that interceptions of conversations of "Doug" and other persons would be evidence of such crimes, or would aid in the apprehension of persons committing these unlawful acts, and that normal investigative procedures had been exhausted, Judge Brown authorized the interception of all conversations of persons known and unknown which pertained to these crimes and concerned the buying, selling, delivery, transfer, and possession of controlled substances. In issuing the warrant, however, the Judge directed law enforcement personnel to minimize the interceptions of conversations not subject to seizure, and ordered that eavesdropping could be effected only during the thirty day period between May 9, 1980, and June 8, 1980.

In their motions to suppress, the defendants contest the two eavesdropping warrants on the following grounds: (1) that the District Attorney of Schenectady County was the improper applicant for the April, 1980, warrant; (2) that the warrants rested upon insufficient probable cause to believe that particular designated offenses had been, were being, or would be committed; (3) that the April, 1980, warrant was grounded upon insufficient probable cause

to believe that conversations pertaining to a particular designated offense would take place over the affected telephones; (4) that the April, 1980, warrant authorized only the seizure of conversations of Michael Lilla; (5) that the April, 1980, warrant issued without any showing that normal alternative investigative channels had been explored; (6) that the April, 1980 warrant failed to specify with particularity the requirements concerning duration and termination; and (7) that the May, 1980, warrant rested upon illegal evidence seized pursuant to the April, 1980, warrant.

■ With respect to the first issue, the defendants claim that the District Attorney of Schenectady County was authorized only to apply for wiretaps on telephones within his county, and that, accordingly, the District Attorney was an improper applicant for a tap on the telephone of Adrian Lilla, who resides in Saratoga County.

There is no question that suppression of some evidence would be required under Title III if the District Attorney were an unauthorized applicant. As the Supreme Court has explained, the detailed federal procedures regarding applications are "important preconditions to obtaining any intercept authority at all," and evidence a congressional intent that wiretapping be utilized with restraint and only where warranted. *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974). "Congress ... made preliminary approval of submissions of wiretap applications a central safeguard in preventing abuse of this means of investigative surveillance..." *United States v. Chavez*, 416 U.S. 562, 571, 94 S.Ct. 1849, 1854, 40 L.Ed.2d 380 (1974) (discussing *Giordano*). Even though *Giordano* involved the suppression of evidence because of the unauthorized application of a federal official, its rationale would appear to govern unauthorized applications by state officials. *Cf: United States v. Tortorello*, 480 F.2d 764, 777–78 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

Examining the language of the pertinent statutes to determine whether the District Attorney was a proper applicant, Title III requires resort to state law in the first instance. This Act provides that "the principal prosecuting attorney of any political subdivision [of any State], if such attorney is *authorized by a statute of that State* to make application to a State court judge of competent jurisdiction for [an eavesdropping warrant]" may apply for authorization to intercept wire communications. 18 U.S.C. § 2516(2) (emphasis supplied). Looking to New York law, New York Criminal Procedure Law [CPL] § 700.10(1) states that an eavesdropping warrant may issue only upon the "application of an applicant who is authorized by law to investigate, prosecute or participate in the prosecution of the particular offense which is the subject of the application." *See* CPL § 700.15(1). "Applicant" has been defined as a "district attorney." CPL § 700.05(5).

In their arguments, several defendants rely heavily upon this statement from the legislative history behind 18 U.S.C. § 2516(2): "Where there are both an attorney general and a district attorney, either could authorize applications, the attorney general anywhere in the State and *the district attorney anywhere in his county.*" S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, at 2187. Certainly the language of this statement lends support to the defendants' position. However, this language must be construed in light of the expressed congressional intent that state law govern the question of whom the proper prosecuting officer would be. *See* 18 U.S.C. § 2516(2); S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, at 2187; *United States v. Giordano*, 416 U.S. at 522–23, 94 S.Ct. at 1829–30. So construed, it is clear that this statement merely reflects an opinion as to what the requirements of state law might be; it does not purport to dictate to states what the geographical authority of their enforcement officers must be.

In this regard, the New York Court of Appeals has interpreted CPL § 700.10(1) as authorizing district attorneys to apply for

eavesdropping warrants on telephones located in counties outside their ordinary spheres of influence, so long as there is a "sufficient nexus" or sufficient "contacts" between the conduct complained of in the application and the county represented by the office of the district attorney. *People v. DiPasquale*, 47 N.Y.2d 764, 765–66, 391 N.E.2d 710, 711, 417 N.Y.S.2d 678, 678–79 (1979) (memorandum) (upholding application of Bronx County District Attorney to tap phone located in New York County). *See People v. Paz*, 109 Misc.2d 832, 441 N.Y.S.2d 183, 197 (Sup.Ct., N.Y.Co.1981). Under this construction of CPL § 700.10(1), the application and supporting affidavit submitted by the District Attorney of Schenectady County establish that he was indeed a proper applicant to seek authorization to intercept conversations on the telephone of Adrian Lilla. These papers charge that Michael Lilla was engaged in drug-related activities at his place of business in Schenectady County, and that he was using his residential telephone in Saratoga County in furtherance of these activities. These alleged actions plainly have a "sufficient nexus" with Schenectady County, so as to make the District Attorney of that county a lawful applicant for an eavesdropping warrant affecting the telephone number listed to Adrian Lilla.

Turning to the various challenges attacking the probable cause allegedly underlying the April, 1980, warrant, no choice of law problem is presented here. Under the Fourth Amendment, Title III, 18 U.S.C. § 2518(3), and under the CPL, CPL § 700.-15(2), (3), & (5), the test is as follows:

> Probable cause . . . exists where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed. . . .

*Berger v. United States*, 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040 (1967). *See United States v. Fury*, 554 F.2d at 530; *People v. Kaiser*, 21 N.Y.2d 86, 103, 233

N.E.2d 818, 828, 286 N.Y.S.2d 801, 815 (1967), *aff'd* 394 U.S. 280, 89 S.Ct. 1044, 22 L.Ed.2d 274 (1969). In applying this test, courts have cautioned that papers in support of eavesdropping warrants must be tested in a common sense manner. *See United States v. Cale*, 508 F.Supp. 1038, 1040 (S.D.N.Y.1981); *People v. Fusco*, 75 Misc.2d 981, 989, 348 N.Y.S.2d 858, 869 (Nassau Co. Ct. 1973). Supporting papers, however, must contain "a full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief" that eavesdropping should be authorized. 18 U.S.C. § 2518(1)(b); CPL § 700.-20(2)(b). Conclusory statements, without more, are altogether inadequate. *See United States v. De Palma*, 461 F.Supp. 800, 807 (S.D.N.Y.1978). In this regard, apart from direct evidence reported in the papers, circumstantial evidence may be sufficient in certain cases to establish probable cause. *See United States v. Cale*, 508 F.Supp. at 1040. Also, probable cause necessarily depends upon the facts of each case. *See United States v. Martino*, 664 F.2d 860, 866 (2d Cir. 1981). Finally, perhaps because of the importance of facts in determining the existence of probable cause, an issuing judge's determination of probable cause is entitled to deference. *See id.* at 867; *United States v. Vasquez*, 605 F.2d at 1281; *People v. Romney*, 77 A.D.2d 482, 484, 433 N.Y.S.2d 941, 943 (4th Dep't 1980).

With respect to the question of whether there was probable cause to believe that particular designated offenses had been, were being, or would be committed, *see* 18 U.S.C. § 2518(1)(b)(i) & (3)(a), CPL § 700.-20(2)(b)(i), the defendants correctly note that the criminal sale of marijuana in the first degree, which the District Attorney of Schenectady County recited in his application for the April, 1980, warrant, is not a "designated offense" under CPL § 700.-05(8). The Government, however, correctly observes that both warrants charge violations of the New York Penal Law regarding the possession and sale of a controlled substance, namely, cocaine, and the attempt and conspiracy to do the same, all "designated offenses" under CPL § 700.05(8)(a) & (c).

■ Examining in this light the allegations set forth in the papers supporting the April, 1980, warrant, this Court concludes that Trooper Cook's conversation with Michael Lilla in regard to the future acquisition of "coke" from Lilla sufficiently established probable cause to believe, at a minimum, that Lilla would be committing a violation of N.Y.Penal Law § 220.31, which prohibits the sale of any quantity of cocaine and which is a "designated offense" under CPL § 700.05(8)(c). Additionally, the conversation between Lilla and the informant, which revealed Lilla's involvement with other persons in transporting narcotics into New York, furnished probable cause to believe that Michael Lilla was conspiring with others to violate N.Y.Penal Law § 220.31. Such a conspiracy would also be a "designated offense." N.Y. CPL § 700.05(8)(a). As to the affidavit of Investigator Girtler in support of the May, 1980, warrant, various intercepted conversations, in code, had linked Robert Lilla, "Doug," "Everett," "Frank," and "Charlie," to dealings in cocaine, see United States v. Aloi, 449 F.Supp. 698, 732–33 (E.D.N.Y.1977), and thus, in the judgment of this Court, supplied at a minimum probable cause to believe that these persons would also be committing a violation of N.Y.Penal Law § 220.31, a designated offense, and would be conspiring to commit the same, CPL § 700.05(8)(a). Because, under New York law, only one designated offense need be supported by probable cause, at least where there is no evidence of bad faith, see People v. Bove, 93 Misc.2d 430, 435, 402 N.Y.S.2d 930, 934 (Sup.Ct., Suffolk Co. 1978), this Court finds that probable cause in regard to designated offenses amply justified the issuance of both eavesdropping warrants.

■ With respect to the question of whether there was probable cause to believe that conversations related to designated offenses would take place over the telephones targeted in the April, 1980 warrant, see 18 U.S.C. § 2518(3)(b), CPL § 700.15(3), Trooper Cook stated in his affidavit that he had been advised by Michael Lilla to telephone Lilla at either his home or place of employment to discuss the future sale and purchase of cocaine. Given this averment, this Court must find that probable cause existed for the authorization of the warrant.

■ In regard to the argument that the April, 1980 warrant authorized only the seizure of conversations by Michael Lilla, several defendants claim that the failure of the state law enforcement officers to obtain an amendment of the warrant to include the interception of conversations of persons other than Michael Lilla mandates suppression. This argument is plainly without merit. The eavesdropping warrant explicitly authorized the seizure of pertinent conversations by persons whose identities were unknown at that time. Additionally, both federal and state law permit the use of communications against persons not named in an eavesdropping warrant, even without amendment of the warrant. See United States v. Tortorello, 480 F.2d at 775; People v. Gnozzo, 31 N.Y.2d 134, 142, 286 N.E.2d 706, 709, 335 N.Y.S.2d 257, 262 (1972), cert. denied sub nom. Zorn v. New York, 410 U.S. 943, 93 S.Ct. 1373, 35 L.Ed.2d 610 (1973). See also CPL § 700.65(4); United States v. Donovan, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977); United States v. Kahn, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974); United States v. Scafidi, 564 F.2d 633, 642 (2d Cir. 1977), cert. denied, 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1978); United States v. Principie, 531 F.2d 1132, 1136–37 (2d Cir. 1976), cert. denied, 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977); United States v. Cale, 508 F.Supp. at 1042–43.

Next the defendants contend that the April, 1980, warrant must fall because the law enforcement officers made little or no attempt to exploit alternative investigative methods, and because the supporting affidavit stated purely conclusory allegations as to the proven, or probable, futility of such methods in this particular investigation. In support of these contentions, the defendants observe that normal investigative procedures had already successfully uncovered important information regarding the source of the narcotics; that the defendant Mi-

chael Lilla certainly was not secretive, evasive, suspicious, cautious, uncooperative, or otherwise sensitive to ordinary investigative methods, as evidenced by the ease with which Cook had arranged, and completed a drug deal; and that there was no reason why normal physical surveillance of Unified Auto could not have proven useful, in view of the location of this establishment on a busy street in a commercial area.

Both sides recognize that federal and state statutory law authorize electronic eavesdropping only when "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c); CPL § 700.15(4). Recently, the New York State Court of Appeals has interpreted the Fourth Amendment to the Constitution of the United States as imposing upon state law enforcement officers a responsibility to use electronic surveillance "only . . . where normal investigative procedures had been tried and failed or are demonstrably unlikely to succeed." *People v. Teicher*, 52 N.Y.2d 638, 656, 422 N.E.2d 506, 515, 439 N.Y.S.2d 846, 855 (1980) (video electronic surveillance).

■ New York statutory law, which governs this issue, *cf: United States v. Fury*, 554 F.2d at 530, also requires that an application for an eavesdropping warrant contain a full and complete "statement of facts" demonstrating the actual, or likely, success of normal investigative procedures. CPL § 700.20(2)(d). Title III has a similar requirement. *Compare* 18 U.S.C. § 2518(1)(c) (a "statement") *with* 18 U.S.C. § 2518(3)(d) ("probable cause"). As interpreted by courts, the purpose of such rules governing the content of eavesdropping applications is to ensure that issuing judges are apprised of the nature and purpose of the investigation and of the difficulties involved in employing normal law enforcement techniques, in order that wiretapping is not routinely resorted to in criminal investigations. *See, e.g., People v. Penna*, 53 A.D.2d 941, 942, 385 N.Y.S.2d 400, 402 (3d Dep't 1976); *People v. Brenes*, 53 A.D.2d 78, 80, 385 N.Y.S.2d 530, 531–32 (1st Dep't

1976) (opinion of two justices), *aff'd on other grounds*, 42 N.Y.2d 41, 364 N.E.2d 1322, 396 N.Y.S.2d 629 (1977); *People v. Holder*, 69 Misc.2d 863, 868, 331 N.Y.S.2d 557, 564 (Sup.Ct., Nassau Co. 1972). *See also United States v. Giordano*, 416 U.S. at 515, 94 S.Ct. at 1826; *United States v. Kahn*, 415 U.S. at 153 & n.12, 94 S.Ct. at 983 & n.12; *United States v. Martino*, 664 F.2d at 868; *United States v. Vasquez*, 605 F.2d at 1282; *United States v. Scafidi*, 564 F.2d at 641; *United States v. Fury*, 554 F.2d at 530; *United States v. Hinton*, 543 F.2d at 1011. The rules are not, however, intended to prohibit the authorization of electronic surveillance until all possible avenues of investigation have been explored. *See People v. Versace*, 73 A.D.2d 304, 308, 426 N.Y.S.2d 61, 64 (2d Dep't 1980). *See also United States v. Martino*, 664 F.2d 860, 868; *United States v. Fury*, 554 F.2d at 530 & n.7; *United States v. Hinton*, 543 F.2d at 1011. Moreover, in applying these rules, courts are to use a practical and common sense approach in their assessments of applications for eavesdropping warrants. *See People v. Versace*, 73 A.D.2d at 308, 426 N.Y.S.2d at 64. *See also* S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, at 2190; *United States v. Martino*, 664 F.2d 860 at 868.

■ Considering the affidavit of Trooper Cook in light of these guidelines, and according appropriate deference to the determination of the issuing judge, this Court concludes that marginally sufficient facts were presented to justify a reasonable belief that normal investigative measures would be unavailing, in terms of garnering sufficient evidence as to the scope of the unlawful narcotics conspiracy. As Cook stated in his affidavit, Michael Lilla had indicated that his brother and, inferentially, at least one other person were in Florida arranging for the transportation of narcotics into the State of New York and particularly into the Schenectady area. Moreover, based upon the conversation which Cook reported he had overheard between Michael Lilla and the informant, common sense would suggest that a number of people

were relying upon Lilla, and, by inference, upon at least one other person, as a source of narcotics. Given the investigative need to ascertain the identities and geographical locations of persons in business with Lilla, and given the probable cause belief that Lilla would use telephones in furtherance of this business, an authorizing judge "could reasonably conclude" that other investigative efforts "would likely have been inadequate", *People v. Penna*, 53 A.D.2d at 942, 385 N.Y.S.2d at 402, "could [not] have been successful", *People v. Brenes*, 53 A.D.2d at 80, 385 N.Y.S.2d at 532, or "were unlikely to reveal" the sought-after information about Michael Lilla's contacts, *People v. Versace*, 73 A.D.2d at 308, 426 N.Y.S.2d at 64. *See also United States v. Martino*, 664 F.2d 868; *United States v. Todisco*, 667 F.2d 255, 259 (2d Cir. 1981); *United States v. Vasquez*, 605 F.2d at 1282; *United States v. Hinton*, 543 F.2d at 1011; *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *United States v. Loften*, 518 F.Supp. 839, 844 (S.D.N.Y.1981). Electronic surveillance here, as asserted by Trooper Cook, would not have been "merely a useful additional tool," *People v. Brenes*, 53 A.D.2d at 80, 385 N.Y.S.2d at 532.

▌ With respect to the challenges to the duration and termination directives of the April, 1980, warrant, the defendants contend that the Cook affidavit failed to set forth sufficient facts calling for the continuation of eavesdropping after the seizure of the first sought-after conversation. In this regard, both federal and state law specify that an eavesdropping warrant must define the duration of the authorized interception," including a statement as to whether or not the intercepting shall automatically terminate when the described communication has been first overheard." 18 U.S.C. § 2518(4)(e); CPL § 700.30(6). *See* CPL § 700.10(2). These laws also require that applications, which request authorization to continue surveillance following the first interception of the described conversation, must contain specific "facts establishing probable cause to believe that additional communications of the same type will occur

thereafter." 18 U.S.C. § 2518(1)(d); CPL § 700.20(2)(e). In applying these requirements, courts have recognized that the nature of the crime involved and the type of conversations sought are factors to consider in determining the longevity of the wiretap authorization. *See People v. Palozzi*, 44 A.D.2d 224, 227, 353 N.Y.S.2d 987, 990 (4th Dep't 1974); *People v. Castania*, 73 Misc.2d 166, 168, 340 N.Y.S.2d 829, 832 (Monroe Co. Ct. 1973). *See also United States v. Clemente*, 482 F.Supp. 102, 107 (S.D.N.Y.1979), *aff'd without opinion*, 633 F.2d 207 (2d Cir. 1980).

Under these standards, the affidavit of Trooper Cook clearly passes muster. Trooper Cook was investigating a conspiracy to traffic controlled substances that was being furthered by use of the telephones. Because "it is extremely unlikely that one telephone conversation would ... establish this conspiracy," *People v. Fiorillo*, 63 Misc.2d 480, 481, 311 N.Y.S.2d 574, 576 (Montgomery Co. Ct. 1970), this Court is not prepared to say that the state judge lacked probable cause to believe that additional communications of the same type would occur after the first sought-after interception.

For these reasons, it appears that the April, 1980, warrant was issued lawfully. Accordingly, the May, 1980, warrant is not subject to challenge as an illegal "fruit."

**B. *Extension of the Eavesdropping Warrant***

Several defendants challenge the validity of the extensions of the April, 1980, and May, 1980, warrants. The following facts are pertinent to this discussion.

On May 23, 1980, the District Attorney of Schenectady County applied to Justice J. Raymond Amyot of the New York State Supreme Court, Schenectady County, for a thirty-day extension of the April, 1980, warrant for the period ending June 23, 1980. In the application and in a supporting affidavit by Trooper Cook, a number of conversations were set forth which had been intercepted pursuant to the initial warrants.

The following are some of these conversations:

> [O]n May 12, 1980, conversations were seized wherein MARK LILLA received a call on [the telephone listed to Adrian Lilla] from a male who identified himself as "PETE." PETE asks MARK what's up? MARK replies, "DOUG" is supposed to call me later tonight. PETE replies, I could use a couple of OZ's. MARK replies if DOUG calls me tonight, I'll be able to call you from the body shop tomorrow and let you know. PETE replies, OK.

> [O]n May, 16, 1980, conversations were seized wherein MARK LILLA received a call on [the telephone listed to Unified Auto] from a male who identified himself as "PETE." PETE asked MARK, did you hear anything yet? MARK replied, no, he called me, as soon as he finds something good, he's going to bring it up. PETE replied, then when he does call, it will be two or three days after that, right? MARK replied, ya. PETE said, I just wanted to get an idea so I could tell some people, you know.

> [O]n May 19, 1980, conversations were seized wherein a male who identified himself as "DOUG" called on [the telephone listed to Unified Auto] and talked to MARK LILLA. DOUG said, we have got to get together and talk. MARK replied, yeah when? DOUG replies, I'll call your house [Adrian Lilla's telephone] tonight. MARK replied, alright, because everybody is pretty ready around here. DOUG replied, ya I know, there's a couple of things in the wind now.

> [O]n May 20, 1980, conversations were seized wherein ROBERT LILLA received a call on [the telephone listed to Unified Auto] from a male who identified himself as "CHRIS." CHRIS asked BOB, you know, 714, you know anybody that wants? BOB replies, no, uh I know what your talking about, I have customers here, when you get a chance stop down and we'll talk.

> [O]n May 20, 1980, conversations were seized wherein ROBERT LILLA received a call on [the telephone listed to Unified Auto] from a male who identified himself as "RICK". RICK asked, I was wondering if you got anymore of those "wheels". BOB replied, no, they're not in yet, I called and they said maybe the end of the week. RICK replied, OK, I could probably use quite a few of them. BOB replied, I'll let you know.

> [O]n May 20, 1980, conversations were seized wherein MARK LILLA received a call on [the telephone listed to Adrian Lilla] from an unknown male. The unknown male asked, is there anything around? MIKE replied, no, I'll call you when it comes around.

In his affidavit, Cook also stated that, based upon other intercepted conversations, "wheels" referred to one pound of marijuana, "714" denoted the controlled substance "Quaaludes", and "OZ's" signified one ounce of the controlled substance cocaine or one ounce of marijuana. Cook then averred that the full scope of the conspiracy had not yet been ascertained, and that the conversations already seized indicated that Robert, Mark, and Michael Lilla would continue to use the telephones to further their trafficking of controlled substances. Relying upon the application of the District Attorney and upon the affidavit of Trooper Cook, Justice Amyot authorized on May 23, 1980, a thirty-day extension of the April, 1980, warrant.

Thereafter, on June 6, 1980, the District Attorney of Saratoga County approached Saratoga County Court Judge Loren N. Brown for a thirty-day extension of the May, 1980 warrant for the period ending on July 6, 1980. The following conversations were reported in the application of the District Attorney and in a supporting affidavit of Investigator Girtler:

> [O]n May 16, 1980, conversations were seized wherein BOB MOFFRE received a call on [the telephone listed to Robert Lilla] from a male who identified himself as CHRIS BURCH. CHRIS says, I don't want to talk on the phone, you know, but I was told you had some stuff, I know some people who are interested if the price is right. BOB says, "BOB" told you the price, right, twenty-one? CHRIS

says, around there. MOFFRE says, the color is good and it spreads real nice and everything else. CHRIS asks, one-hundred percent? MOFFRE replies, I don't have that kind of accuracy, but it's right up there.

[O]n May 16, 1980, conversations were seized wherein ROBERT LILLA called out on [his telephone] to a male identified as THOMAS DiCOCCA. BOB tells TOM, your buddy wants 1075 and I ain't making a nickel. I'm just taking it from him and giving it to you. If your guys want it, I'll bring it down.

[O]n May 18, 1980, conversations were seized wherein ROBERT LILLA received a telephone call on [his telephone] from a male identified as DOUG PINTKA. DOUG asks BOB how things are and BOB replies, everybody is waiting. DOUG says he should be ready in a couple of days. We'll do something this week, for sure. We could do something right now, but you got to walk in with cash and carry. BOB replies, well forget that. I haven't heard anything in a while and everybody up here is dying for it." DOUG asks BOB, how's things with you, and BOB replies, everybody is alright, I even conjured up some new business, so things should move even faster. DOUG tells BOB that he will be bringing up three or four hundred to do real quick. BOB replies, you could even bring five, I've got a couple of people that got cash for the stuff now. DOUG then says, alright, I'll bring five. DOUG says, tell MARK the "WHITE" fell through, I don't want to mix business. BOB says, I talked to CHARLIE and he said, you give me three hundred and in two days I'll have all the money. BOB then says to DOUG, if you bring like five up this time, in a weeks time—DOUG interrupts and says, we'll probably have some more word. BOB replies, okay, because everybody's waiting.

[O]n June 1, 1980, conversations were seized wherein BOB LILLA, using [his telephone] called a subject identified as FRANK. BOB says to FRANK, I can bring the car up there, he has to get 21, call your guy, the quality of the body work is there. FRANK says, I can pick it up and pay you tomorrow. BOBBY replies, yeah.

Investigator Girtler stated further in his affidavit that, based upon other intercepted conversations, "color" and "percent" referred to cocaine; "1075" was $1,075.00, the going rate for one-half ounce of cocaine; "21" was $2,100.00, the going price for an ounce of cocaine; and that "White" denoted cocaine. Girtler next asserted that the full scope of the conspiracy had not yet been fully ascertained, and that several seized conversations indicated that Robert Lilla and others would continue to use the telephone to further their business of drug trafficking. Upon receiving this affidavit, and the application of the District Attorney, Judge Brown authorized on June 6, 1980 a thirty-day extension of the May, 1980 eavesdropping warrant.

Several defendants have raised objections to the extensions of the two warrants. First, they contend that the application for an extension of the April, 1980 warrant should have been brought to Justice Viscardi, because he had issued the initial warrant. Second, they maintain that the supporting affidavit of Trooper Cook contains certain intentional misrepresentations which, when put aside, remove the factual basis to justify an extension of the April, 1980, warrant. Specifically, they note that the log book of May 19, 1980, refers to "Z's", not "OZ's", and that "Z's" is a common slang word for sleep or rest. Furthermore, they claim that the log book of May 19, 1980, contains no statement "I'll call your house [Adrian Lilla's telephone] tonight", and that the May 29, 1980, call between Mike Lilla and an unknown male is too vague to supply any basis for determining that the telephone listed to Adrian Lilla was being used for drug dealings. For their third argument, the defendants assert that by failing to specifically identify Mark Lilla in the extension of the April, 1980, warrant, as a target figure, the law enforcement officers had unlawfully failed to apprise the authorizing judge of the identi-

ties of all persons whose conversations were to be seized. Finally, the defendants state that both extensions must be suppressed as illegal "fruits."

 In regard to the first argument, CPL § 700.40 provides that "[a]t any time prior to the expiration of an eavesdropping warrant, the applicant may apply to the issuing justice, or, if he is unavailable, to another justice, for an order of extension." The defendants claim that the Government has made no showing here that the issuing justice was unavailable, and that, accordingly, the extension of the April, 1980, warrant was unlawful. Contrary to the assertions of the defendants, a showing of unavailability has been made. The Government has submitted a sworn affidavit of New York State Police Investigator Ralph Marshall, in which the Investigator states that the "warrant extension was taken before Justice Amyot due to the then unavailability of Justice Viscardi." In view of this sworn averment, and in the absence of any contrary evidence in the present record before the Court, it appears that the defendants' argument is without merit.

 As for the second argument, it is well-settled that even if allegations of deliberate falsehood or of reckless disregard for the truth are taken as true, a warrant will not be held unlawful if, setting aside the questioned material, there is sufficient information to support a finding of probable cause. See Franks v. Delaware, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978). Putting aside the alleged falsities cited by the defendants, this Court finds that probable cause remains to justify the extension of the April, 1980, warrant affecting the telephones of both Unified Auto and Adrian Lilla. For example, the May 20, 1980, conversation between Robert Lilla and "Chris" concerning "714" is strong evidence that the telephone listed to Unified Auto was being used by Robert Lilla for the purpose of drug trafficking. Additionally, when considered together, the conversation of May 12, 1980, between Mark Lilla and "Pete" over the telephone listed to Adrian Lilla; the conversation of

May 16, 1980, between Mark Lilla and "Pete" over the telephone listed to Unified Auto; the conversation of May 19, 1980, between Mark Lilla and "Doug" over the telephone listed to Unified Auto; and the May 20, 1980, conversation between Mark Lilla and an unknown male over the telephone listed to Adrian Lilla tend to suggest that Mark Lilla was using both telephones to deal in unlawful drugs. This argument by the defendants, then, is also without merit.

 With respect to the argument that the extension of the April, 1980, warrant should have specified the identity of Mark Lilla, it is sufficient here that the supporting affidavit of Cook specifically named Mark Lilla, and Robert Lilla, as target figures. Accordingly, this argument must fall.

Finally, to the extent that the April, 1980, and May, 1980, warrants were lawfully issued, the evidence derived from the extensions of these warrants is not subject to suppression as tainted "fruit."

### C. Minimization

The defendants next assail the minimization efforts of monitoring officers. On this issue, the following facts emerge from the suppression hearing.

New York State Police Investigator Ralph Marshall, a witness on behalf of the Government who attested to having previous experience regarding wiretapping, testified that he was in charge of the monitoring of telephones affected by the April, 1980, and May, 1980, warrants and extensions. Prior to the issuance of the first warrant, Marshall stated, Captain G. E. Looney, who was in charge of the Bureau of Criminal Investigation for Troop G, met with him and three other monitoring agents to discuss, among other matters, minimization. These other agents were Investigator Girtler, Trooper Cook, and Investigator Morris. According to an outline of this meeting, which was prepared by Marshall, Captain Looney advised the agents to monitor all conversations of suspects, including Robert Lilla, Michael Lilla, and Mark Lilla,

that dealt with the designated offenses and with other crimes, and to use a two-minute "rule of thumb" regarding the monitoring of all other, "non-pertinent" conversations. This rule of thumb, Marshall explained, provided that generally, a monitoring agent would be able to determine within two minutes whether a conversation is covered by an eavesdropping warrant. This rule, Marshall elaborated, did not mean that an officer should monitor all conversations for two minutes; an officer might be able to ascertain within thirty seconds that a conversation is non-pertinent, in which event the officer would cease intercepting the conversation. Marshall noted further that no specific instructions were given as to the types of conversations that would be deemed non-pertinent. Finally, Marshall indicated that no instructions were given on the matter of privileged communications; he suggested further, however, that he and the other agents were aware of privileges, and would cease monitoring if they determined a conversation to be privileged.

Shortly after the issuance of the first warrant, Marshall testified that he met with Investigators Girtler, Cook and Morris, and instructed them again on the requirements of minimization. Marshall stated how he had explained to the agents that for calls identified as non-pertinent, two buttons were to be activated on the recording device; these buttons would terminate both recording and hearing. Marshall continued by stating that after these buttons had been activated, an officer might resume monitoring in order to determine whether a conversation had remained non-pertinent. Additionally, Marshall indicated that he directed these investigators not to leave the recording device when it was functioning.

As for the actual process of interception, Marshall stated that the conversations on the Unified Auto telephone were monitored during the business hours, and that the residential telephones were monitored almost 24 hours a day during the first week, and then were monitored from 8:00 a. m. until 12:00 midnight or 1:00 a. m. once the officers had identified the patterns of phone use. Marshall explained further that

log books were placed next to the recorder. As a conversation began, Marshall testified, officers would note in the log book whether the call was incoming or outgoing, the time of the call, and give a summary of the conversation. A meter on the recorder, Marshall stated further, reflected the length of time between a telephone receiver being picked up and being replaced; each meter reading signified a lapse of five to seven seconds. Marshall revealed, however, that one could not determine the actual length of a conversation from the meter readings because the meter did not reflect the time that a person might be on "hold" or might otherwise be waiting for the person at the other end of the telephone wire. Marshall went on to testify that on approximately a daily basis, he would review the log books with the monitoring agents, identifying for them pertinent conversations that had been intercepted for more than two minutes. Apart from the directives in the eavesdropping warrants regarding minimization and privileged communications, Marshall further established that there was no judicial supervision, and no supervision by the offices of the district attorneys.

In regard to the success of the two-minute "rule of thumb", Marshall explained that there were specific reasons why non-pertinent conversations were intercepted for more than two minutes. Some such intercepted calls, Marshall indicated, represented efforts by monitoring agents to break a code used by the suspects and to identify members of the conspiracy. The rule itself remained in effect even after the code had been broken. With respect to one particular conversation, between two females who were not suspects, that had been monitored for almost twenty minutes, Marshall stated that this conversation had been seized by an investigative officer who was not part of the regular monitoring team and who had received no instructions from Marshall concerning minimization. According to Marshall, this investigator, Investigator Bailey, maintained the recorder during the afternoon of June 9, 1980, until relieved by Investigator Morris that evening, and

during the morning of June 10, 1980, until Marshall returned from an unexpected investigative trip. Both Girtler and Marshall had apparently been suddenly called away on the afternoon of June 9, 1980, leaving no regular monitoring officer to operate the recorder. Rather than turning off the machine, Marshall testified that he instead directed Investigator Bailey to conduct the monitoring.

A second witness on behalf of the government was DEA agent Raymond W. Tripp, Jr. Tripp analyzed the minimization efforts of the monitoring agents and offered the following statistics: that of the 2,366 actual calls monitored over the telephone listed to Unified Auto, 2,072 or 87.6% were non-pertinent; that of the 845 actual calls monitored over the telephone listed to Adrian Lilla, 779 or 92.2% were non-pertinent; and that of the 449 actual calls monitored over the telephone listed to Robert Lilla, 382 or 85% were non-pertinent. Tripp noted that he regarded as pertinent a few conversations which had been identified by monitoring agents as non-pertinent. Additionally, Tripp shared Marshall's opinion that meter readings commenced when the phone was off the hook, and ceased when the phone was replaced, thus signifying that one could accurately ascertain the length of conversations only by listening to the tapes, and not by examining the meter readings.

Also at the suppression hearing, the defendants made an offer of proof to the effect that the meter readings fairly accurately reflect the length of the conversation. The defendants continued by proffering these figures concerning the seizure of non-pertinent conversations in excess of two minutes, basing these statistics on their examinations of the log books: that of the 1450 non-pertinent calls on the telephone listed to Unified Auto, 93 or 4% were monitored for over two minutes; that of the 527 non-pertinent conversations on the telephone listed to Adrian Lilla, 37 or 7% were monitored for over two minutes; and that of the 449 non-pertinent calls on the telephone listed to Robert Lilla, 33 or 7.3% were monitored for over two minutes.

Finally, at the hearing all counsel stipulated that the meter would change readings approximately every six seconds. At this same time, the Court heard four non-pertinent conversations over the telephone listed to Unified Auto that had been intercepted in their entirety in excess of two minutes. One of these calls was from Robert Lilla to a restaurant in regard to a party; a second call was among three defendants. Apart from these calls, the defendants called to the Court's attention four other intercepted telephone calls which had been made to attorneys, a conversation in Italian between Adrian Lilla and another person which the monitoring agent had recorded in its entirety, and a conversation seized over the Unified Auto telephone between "Chris" and a "Dr. Paul."

In objecting to the minimization efforts of the monitoring officers, the defendants make two general arguments: that the agents made no attempt to minimize non-pertinent conversations, and that the agents should have minimized the interception of conversations of all persons not specifically named in the eavesdropping warrant.

On this issue, which concerns the execution of the eavesdropping warrants, New York law governs to the extent that it is not inconsistent with federal law. *See United States v. Sotomayor*, 592 F.2d at 1225, 1226; *United States v. Hinton*, 543 F.2d at 1011; *United States v. Capra*, 501 F.2d 267, 275 (2d Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975); *United States v. Rizzo*, 491 F.2d 215, 217 (2d Cir.), *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974); *United States v. Manfredi*, 488 F.2d at 598. Turning, then, to state law, CPL § 700.30(7) states that eavesdropping warrants must require officers "to minimize the interception of communications not otherwise subject to eavesdropping . . . ." *Cf*: 18 U.S.C. § 2518(5). As interpreted by New York courts, minimization imposes upon officers a duty to make "a good faith and reasonable effort to keep the number of nonpertinent calls intercepted to the smallest practi-

cable number." *People v. Floyd*, 41 N.Y.2d 245, 250, 360 N.E.2d 935, 940, 392 N.Y.S.2d 257, 262 (1976). *See People v. Calogero*, 75 A.D.2d 455, 459, 429 N.Y.S.2d 970, 973 (4th Dep't 1980); *People v. Estrada*, 97 Misc.2d 127, 130, 410 N.Y.S.2d 757, 759 (Sup.Ct. Queens Co. 1978). *See also United States v. Capra*, 501 F.2d at 275; *United States v. Manfredi*, 488 F.2d at 600. *Cf: Scott v. United States*, 436 U.S. 128, 139, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978) (Title III).

■ In a judicial proceeding to determine whether officers in fact acted reasonably and in good faith, the prosecuting body bears the initial burden of establishing "that procedures were established to minimize interception of nonpertinent communications and that a conscientious effort was made to follow such procedures." *People v. Floyd*, 41 N.Y.2d at 250, 360 N.E.2d at 940, 392 N.Y.S.2d at 262. *See People v. Brenes*, 42 N.Y.2d at 46, 364 N.E.2d at 1326, 396 N.Y.S.2d at 633; *People v. Calogero*, 75 A.D.2d at 461, 429 N.Y.S.2d at 974. *See also United States v. Hinton*, 543 F.2d at 1012. Although such a determination must necessarily be made on a case by case basis, *see People v. Floyd*, 41 N.Y.2d at 250, 360 N.E.2d at 940, 392 N.Y.S.2d at 262; *People v. Calogero*, 75 A.D.2d at 461, 429 N.Y.S.2d at 974; *see also United States v. Manfredi*, 488 F.2d at 599; *cf: Scott v. United States*, 436 U.S. at 140, 98 S.Ct. at 1724, thus making impossible the application of a wooden rule, a number of factors are relevant to the issue of minimization:

> [t]he nature and scope of the actual investigation; the character and sophistication of the parties who are its targets and the nature of their expected associates; the extent of the official supervision devoted to each step of the surveillance; the possibility and practicality of determining, contemporaneously with their investigation, whether particular conversations are in fact pertinent to the objectives of the investigation; these are among the many factors to be taken into account.

*People v. Brenes*, 42 N.Y.2d at 46, 364 N.E.2d at 1326, 396 N.Y.S.2d at 633.

■ Applying these principles here, not only did the law enforcement officers establish reasonable procedures regarding interceptions, they also reasonably and in good faith applied these procedures. It is true that, upon inspection of the log books, the monitoring agents may not have strictly abided by their procedures with respect to all conversations over the three targeted telephones. The log books reflect few instances where the machines were "off" and "back on." Most of the intercepted conversations, however, were less than two minutes in duration. This short period of time unquestionably caused difficulties in determining pertinency. *See People v. Floyd*, 41 N.Y.2d at 253, 360 N.E.2d at 942, 392 N.Y. S.2d at 264; *People v. Calogero*, 75 A.D.2d at 461, 429 N.Y.S.2d at 974; *People v. Carter*, 81 Misc.2d 345, 349, 365 N.Y.S.2d 964, 969 (Nassau Co. Ct.1975). *See also United States v. Capra*, 501 F.2d at 275–76. Even with such brief calls, the agents did make some attempt to minimize, for example, nonpertinent communications of a targeted figure.

As for the conversations monitored in excess of two minutes, several circumstances here justified a surveillance large in scope, at least beyond the mere monitoring of conversations by persons specifically identified in the eavesdropping warrants. These same circumstances, moreover, made it difficult to formulate instructions that would successfully minimize the interception of all innocent conversations. First, the investigative officers were endeavoring to uncover the identities of persons in what appeared to be, certainly geographically speaking, a wide-spread narcotics conspiracy. *See People v. Floyd*, 41 N.Y.2d at 251, 360 N.E.2d at 941, 392 N.Y.S.2d at 263; *People v. Calogero*, 75 A.D.2d at 459, 429 N.Y.S.2d at 973. *See also United States v. Manfredi*, 488 F.2d at 599, 600. Second, it appears from the log books that the targeted suspects were aware that their conversations were being monitored, thus increasing the possibility that these suspects might use unwitting persons to convey pertinent information. *See People v. Floyd*, 41 N.Y.2d

at 251, 360 N.E.2d at 941, 392 N.Y.S.2d at 263. *See also United States v. Bynum*, 485 F.2d 490, 501 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 903, 94 S.Ct. 2958, 41 L.Ed.2d 209 (1974). Finally, the suspects utilized a code, and at least three targeted figures were blood relations. These factors hampered efforts at minimization, because officers could neither quickly ascertain whether conversations were pertinent, nor readily identify patterns of nonpertinent communications. *See People v. Floyd*, 41 N.Y.2d at 250–51, 360 N.E.2d at 940–41, 392 N.Y.S.2d at 262, 263. *See also United States v. Manfredi*, 488 F.2d at 599.

Examining, in light of these circumstances, the calls intercepted in excess of two minutes, and taking as accurate the figures of 4%, 7%, and 7.3%, such interceptions were small in number, thus indicating that the officers reasonably and conscientiously attempted to comply with their minimization procedures. *See People v. Floyd*, 41 N.Y.2d at 253, 360 N.E.2d at 942, 392 N.Y.S.2d at 264; *People v. Carter*, 81 Misc.2d at 349, 365 N.Y.S.2d at 969.

Several further observations are in order concerning the execution of these eavesdropping warrants. To begin, the monitoring agents should have received explicit instructions regarding privileged communications. *See* CPL § 700.20(2)(c). However, it is obvious that any conversation to which a privilege would attach, would also be nonpertinent. Accordingly, where, as here, no serious argument has been presented that, under the circumstances, the officers unreasonably seized truly privileged communications, it is marginally sufficient that agents were instructed with respect to the procedures for ceasing interceptions of conversations deemed nonpertinent. In addition, although the New York Court of Appeals has expressed its preference that an eavesdropping warrant require periodic progress reports to the issuing judge in order to ensure judicial supervision over minimization efforts, *see People v. Floyd*, 41 N.Y.2d at 253, 360 N.E.2d at 942, 392 N.Y.S.2d at 264 (construing CPL § 700.50(1)), this Court is satisfied that here, law enforcement officers exercised prudence, restraint, and

sound judgment in their execution of the eavesdropping warrants. Finally, it may be that on the afternoon of June 9, 1980, and the morning of June 10, 1980, the officers ought not to have placed an individual in charge of the recording equipment without giving him instructions on minimization. The effect of this assignment was to leave the eavesdropping machines essentially unmonitored, which is an unlawful practice according to one New York court. *See People v. Castania*, 73 Misc.2d at 171, 340 N.Y.S.2d at 835. Suppression, in any event, might be unwarranted under the circumstances. *Cf: People v. Brenes*, 42 N.Y.2d at 49, 364 N.E.2d at 1328, 396 N.Y.S.2d at 635.

For the foregoing reasons, this Court concludes that the monitoring officers did not indiscriminately intrude upon the privacy of the persons whose conversations were intercepted. *See People v. Brenes*, 42 N.Y.2d at 48, 364 N.E.2d at 1327, 396 N.Y.S.2d at 634; *People v. Floyd*, 41 N.Y.2d at 250, 360 N.E.2d at 940, 392 N.Y.S.2d at 262. "The government agents conducting the surveillance . . . have shown a 'high regard for the right of privacy and have done all they reasonably could do to avoid unnecessary intrusion' ". *People v. Floyd*, 41 N.Y.2d at 250, 360 N.E.2d at 940, 392 N.Y.S.2d at 262 (quoting *United States v. Tortorello*, 480 F.2d at 784).

### D. *Post-Interception Matters*

For their final challenges to the electronic surveillance conducted here, the defendants object to the sealing of the tapes, to certain orders extending the times for the services of notices of inventory, and to orders amending *nunc pro tunc* the eavesdropping warrants and extensions. Additionally, they have raised a question as to whether the tapes were ever unsealed without proper judicial authorization. The following facts are relevant to a consideration of these issues.

By Orders dated May 23, 1980, Justice Amyot directed the sealing and storage, in an evidence locker at New York State Police headquarters, Troop G, of 31 reels of

tape resulting from the Unified Auto wiretap, and of 23 reels of tape resulting from the Adrian Lilla wiretap. Both tapes would have expired on May 24, 1980, but, as noted above, were extended by Orders of Justice Amyot dated May 23, 1980. These extensions expired on June 23, 1980, the date on which the wiretaps were in fact discontinued. Three days later, on June 26, 1980, Supreme Court Justice D. Vincent Cerrito ordered the sealing and storage, in the same evidence locker, of 32 reels of tape resulting from the extension of the Unified Auto tap and of 30 reels resulting from the extension of the Adrian Lilla wiretap.

Investigator Marshall testified at the hearing, and presented an affidavit, about the sealing and storage of these Schenectady tapes. According to Marshall, throughout the course of the interception, reels of tape would be removed from the machines, placed in marked boxes, and placed in the evidence locker whenever the machines were not being monitored and whenever a reel of tape became "full." Only the four monitors had access to this evidence locker, which was located in a locked office of the monitoring officers. In regard to the sealing of the reels used during the extension period, Marshall stated that one, two, or three days prior to the end of the extension period, he contacted the District Attorney of Schenectady County to arrange for a time in which he could secure judicial sealing of the tapes. At some time thereafter, Marshall indicated, the District Attorney, who assumes responsibility for making the arrangements to appear before a judge, informed Marshall that due to the unavailability of other Justices involved with the Schenectady wiretaps, Supreme Court Justice Cerrito would seal the tapes on June 26, 1980. Marshall testified that during the three day period between the discontinuance of the wiretaps and his appearance before Justice Cerrito, he prepared the necessary papers for the sealing and storage of the tapes, and checked the tapes. At all times during these three days, Marshall stated, the tapes were stored in the evidence locker.

As for the wiretap on the telephone of Robert Lilla, the initial eavesdropping warrant expired on June 8, 1980. It was on June 6, 1980, however, that 24 reels of tape accumulated during this period were ordered sealed and stored, in the evidence locker, by Judge Brown. Also on June 6, 1980, Judge Brown authorized an extension of this wiretap through July 6, 1980. One day before the expiration of this extension period, July 5, 1980, the wiretap was discontinued. The 22 reels of tape utilized during the extension period were sealed 16 days later, on July 21, 1980, by Judge Brown.

With respect to this sixteen day delay in sealing, Marshall asserted that following his discussion with the District Attorney of Saratoga County regarding the arrangements for sealing, the District Attorney told him that Judge Brown, the only County Court Judge for Saratoga County, was sitting as an Acting Supreme Court Justice in Schenectady County from July 6 through July 11. The record does not clearly indicate the date on which Marshall contacted the District Attorney concerning the sealing arrangements; it appears to have been toward the very end of the thirty day extension period. The record also does not reflect when the District Attorney first related the information regarding Judge Brown's situation. Marshall testified, however, that a week after this communication from the District Attorney, the District Attorney related to him further that Judge Brown would be on vacation from July 14, through July 18, and would consequently not return to his office in Saratoga County until July 21, 1980. Marshall stated his belief, in this regard, that the District Attorney was of the opinion that only Judge Brown could direct the sealing and storage of the tapes, because he had been the issuing judge. Marshall indicated also that because the District Attorney was responsible for securing appearances before judges, he, Marshall, had made no independent effort to travel to Schenectady to appear before Judge Brown, or to seek out any other state judge for judicial sealing of the tapes. Finally, Marshall testified that during the interception periods, and during the sixteen

days prior to the sealing of the tapes, the reels were stored in the same manner as the Schenectady tapes.

After the sealing of the Schenectady and Saratoga tapes, Justice Cerrito, on September 9, 1980, issued an order delaying for 180 days the services of the notices of inventory upon Michael Lilla and "his co-conspirators." The Justice found that exigent circumstances warranted such a delay. As set forth in a supporting affidavit of the District Attorney of Schenectady County, these exigent circumstances concerned continued State law enforcement efforts to identify all of the conspirators. The District Attorney stated that inasmuch as service at that time might alert the conspirators of the existence of an investigation, a postponement of service would be appropriate.

Another 180 day delay of the service of notice concerning the Schenectady wiretaps was authorized on March 16, 1981, by Supreme Court Justice Guy A. Graves, again upon a finding of exigent circumstances. In his supporting affidavit, the District Attorney once more asserted that State law enforcement personnel were attempting to uncover the full scope of the conspiracy. Additionally, the District Attorney stated that the United States Attorney for the Northern District of New York had become involved in the investigation.

In regard to this involvement of the United States Attorney, on March 2, 1981, Justice Graves and Judge Brown issued separate orders directing the unsealing of the tapes resulting from the Schenectady and Saratoga wiretaps. The orders issued by the judges specified that the unsealing was for the purpose of duplication, and that the ensuing copies of the tapes were to be turned over to Assistant United States Attorney George A. Yanthis for his use. In their application for the unsealing orders, dated March 2, 1981, the District Attorneys of Schenectady and Saratoga Counties noted that although unsealing orders had been issued on December 3 and 4, 1980, for purposes of duplication of the tapes and use by the office of the United States Attorney, the tapes, to date, had remained sealed and

had not been duplicated. Subsequently, on March 12, 1981, following duplication, the tapes were resealed. The next day, March 13, 1981, Justice Graves and Judge Brown signed separate orders amending *nunc pro tunc* the Schenectady and Saratoga eavesdropping warrants and extensions to authorize the interception of conversations pertaining to federal narcotics violations, *viz.*, 21 U.S.C. §§ 841 (distribution), 843 (use of communication facility), 844 (possession) and 846 (attempt, conspiracy). The orders also authorized the use of evidence acquired from the wiretaps in federal grand jury proceedings. Both judges found that during the interception of conversations over the telephones of Unified Auto, Adrian Lilla, and Robert Lilla, State monitoring officers seized communications relating to offenses not specified in the authorization orders. In his applications for these amendments, Assistant United States Attorney Yanthis stated that communications intercepted pursuant to the eavesdropping warrants and extensions indicated that certain federal offenses were being committed, offenses that were parallel or closely related to the state offenses designated in the authorization orders.

Turning to the sealing of the tapes, the defendants first argue that state law should govern this issue. Additionally, they contend that the Schenectady tapes acquired during the extension period should be suppressed because the three day delay in sealing was unreasonable, and because Justice Cerrito was not the issuing judge. The defendants also assert that the Saratoga tapes containing conversations seized during the extension period should be suppressed because the 16 day delay in sealing was unreasonable and insufficiently explained. In this regard, certain defendants maintain that law enforcement officials should have traveled to Judge Brown's chambers in Schenectady to secure judicial sealing, and that, in any event, state officials should have realized that it was not necessary for an issuing judge to seal the tapes.

Both the federal and state statutory schemes contain provisions for the immediate sealing of tapes recorded during the execution of a wiretap warrant or extension. Title III, 18 U.S.C. § 2518(8)(a) requires that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." As interpreted by federal courts, this section permits the sealing of all tapes upon the expiration of the last order of extension. *See United States v. Vasquez*, 605 F.2d at 1275–77; *United States v. Scafidi*, 564 F.2d 633, 641 (2d Cir. 1977), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1978); *United States v. Fury*, 554 F.2d at 533. The State sealing requirements, which are contained in CPL § 700.50(2), are somewhat different: "Immediately upon the expiration of the period of an eavesdropping warrant, the recording or communications . . . must be made available to the issuing justice and sealed under his directions." The New York Court of Appeals has construed this statute as requiring sealing after the expiration of each order or extension authorizing electronic surveillance. *See People v. Washington*, 46 N.Y.2d 116, 121–23, 385 N.E.2d 593, 594–96, 412 N.Y.S.2d 854, 856–58 (1978).

■ In recent years, the Second Circuit has had occasion to decide the question of whether state, or federal, law governs controversies concerning the sealing of tapes. The rulings of this Circuit have been that federal law controls, because sealing implicates matters pertaining to the admissibility of evidence, and not to the State's interest in protecting the privacy of its citizens. *See United States v. Vasquez*, 605 F.2d at 1275–77; *United States v. Sotomayor*, 592 F.2d at 1225–26. Although the New York Court of Appeals has regarded the State's sealing provision as an integral part of a larger scheme designed to protect the privacy of individuals, *see People v. Washington*, 46 N.Y.2d at 121, 385 N.E.2d at 595, 412 N.Y.S.2d at 857; *see also United States v. Gigante*, 538 F.2d 502, 505 (2d Cir. 1976), and although the defendants have per-

suasively argued that sealing serves the important purpose of preventing tapes being indiscriminately listened to by persons acting without court authorization, and thus protects the confidentiality of the recorded conversations, this Court is somewhat constrained to apply the holdings enunciated by the Second Circuit.

■ With respect to the delays in the sealing of the tapes, the Government must present a satisfactory explanation where, as here, tapes have not been immediately sealed, or at least not sealed within one or two days following the termination of the wiretaps. *See United States v. McGrath*, 622 F.2d 36 at 42 (2nd Cir.); *United States v. Vasquez*, 605 F.2d at 1278; *United States v. Gigante*, 538 F.2d at 506–07. The general inquiry into whether an explanation is satisfactory boils down to an assessment of the reasonableness of the delay. *See United States v. Fury*, 554 F.2d at 533. Specific factors to be taken into account include the length of the delay; the diligence of the law enforcement personnel; the existence of any evidence of tampering; the time required to prepare the tapes for sealing; the possibility of prejudice to the defendants caused by the delay; and the presence of any bad faith on the part of law enforcement agencies, such as an intent to evade the sealing requirements or to gain a tactical advantage. *See United States v. McGrath*, 622 F.2d at 42–43; *United States v. Vasquez*, 605 F.2d at 1279; *United States v. Scafidi*, 564 F.2d at 641; *United States v. Fury*, 554 F.2d at 533; *United States v. Poeta*, 455 F.2d 117, 122 (2d Cir.), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972).

■ Applying these principles to the facts presented here, this Court finds that the Government has satisfactorily explained the delay in the sealing of the Schenectady tapes. Given the brief time required to prepare the tapes and the necessary papers, and the wait occasioned by Justice Cerrito's schedule, the three day delay was reasonable under the circumstances. Moreover, the tapes were securely stored during this peri-

**1272**

od, and there has been no evidence that the tapes were altered, that the State agencies acted in bad faith, or that the defendants have suffered prejudice as a consequence of the delay. In this regard, it is not necessary as a condition of admissibility that these tapes have been sealed before an issuing judge. *See United States v. Vasquez,* 622 F.2d at 1280 n.25; *United States v. Fury,* 554 F.2d at 533; *United States v. Poeta,* 455 F.2d at 122. *See also People v. Pecoraro,* 58 A.D.2d 462, 469, 397 N.Y.S.2d 60, 65 (2d Dep't 1977) (opinion of 2 Justices) *overruled sub silentio on other grounds, People v. Washington,* 46 N.Y.2d 116, 385 N.E.2d 593, 412 N.Y.S.2d 854 (1978). *Cf: People v. Nicoletti,* 34 N.Y.2d 249, 253, 313 N.E.2d 336, 338, 356 N.Y.S.2d 855, 858 (1974).

■ The sixteen day delay in sealing the Saratoga tapes presents a more troublesome problem. The only explanation for the length of the delay that merits examination is the belief of the District Attorney of Saratoga County that he was obliged to appear only before Judge Brown and only in Judge Brown's Saratoga chambers. Contrary to the allegations of the defendants, the District Attorney's perception of his duties under State law may have been accurate, or at least rested upon good faith, to the extent that New York courts appear to have strictly construed the statutory requirement that sealing be accomplished by an issuing judge. *See People v. Nicoletti,* 34 N.Y.2d at 253, 313 N.E.2d at 338, 356 N.Y.S.2d at 858; *People v. Darienzo,* 68 A.D.2d 806, 414 N.Y.S.2d 7, 8 (1st Dep't 1979); *People v. Blanda,* 80 Misc.2d 79, 81, 362 N.Y.S.2d 735, 739 (Sup.Ct., Monroe Co. 1974). *But see People v. Pecoraro,* 58 A.D.2d at 469, 397 N.Y.S.2d at 65. The Court also notes that the tapes were securely stored and that the defendants do not seem to have been prejudiced by the delay. For these reasons, and in the absence of any indication that the District Attorney was motivated by impermissible factors, the sixteen day delay was not unreasonable. This determination stands even though the District Attorney presumably was aware of the requirement under State law that tapes be

immediately sealed, and even though perhaps earlier arrangements should have been made concerning the judicial sealing of the tapes. In making this conclusion, however, the Court is of the opinion that although Judge Brown may have been unavailable at his Saratoga chambers, he certainly was not geographically inaccessible while he was sitting in Schenectady County as a State Supreme Court Justice.

With respect to the challenges to the notice of inventory, the defendants claim that services of the notices were postponed for an unreasonable period of time.

Both federal and state law provide that within a reasonable time, and in no event later than 90 days following the termination of the surveillance, persons who were named in an eavesdropping warrant, and, in the discretion of the judge, other persons who were parties to intercepted conversations, must receive notice that, *inter alia,* communications were seized over the affected telephones. *See* 18 U.S.C. § 2518(8)(d); CPL § 700.50(3). These laws also permit a delay in the service of such notice of inventory. Under Title III, a court may postpone service on a "showing of good cause." 18 U.S.C. § 2518(8)(d). Under the CPL, extensions are authorized in this manner:

> On a showing of exigent circumstances . . . the service of the notice . . . may be postponed by order of the justice for a reasonable period of time. Renewals of an order of postponement may be obtained on a new showing of exigent circumstances.

CPL § 700.50(4).

Before addressing the merits of the defendants' objections, it is necessary to consider, briefly, what law governs this issue. Following a scrutiny of current New York law, there appears to be no indication that state courts have interpreted the State notice provision more strictly than Title III. *Cf: United States v. Variano,* 550 F.2d 1330, 1336 n.10 (2d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 269, 54 L.Ed.2d 178 (1977); *United States v. Principie,* 531 F.2d

at 1142 n.12. Accordingly, it is effectively immaterial, in this case, whether state or federal law controls the issue of notice.

■ In interpreting the notice requirements, courts have generally tended to agree that, as for persons entitled to notice, delays in service must be reasonable and must not cause prejudice to these individuals. *See United States v. Fury,* 554 F.2d at 528; *United States v. Rizzo,* 492 F.2d 443, 447 (2d Cir.), *cert. denied,* 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974); *United States v. Manfredi,* 488 F.2d at 601–02; *People v. DiLorenzo,* 69 Misc.2d 645, 652, 330 N.Y.S.2d 720, 728 (Rockford Co.Ct. 1971). *Cf: United States v. Gigante,* 538 F.2d at 507 n.9. Suppression is ordinarily not a sanction available to persons entitled to discretionary notice, at least where no prejudice is shown. *See United States v. Donovan,* 429 U.S. 413, 439 n.26, 97 S.Ct. 658, 674 n.26, 50 L.Ed.2d 652 (1976). *See also United States v. Fury,* 554 F.2d at 528.

■ Without ascertaining whether each defendant here was entitled to mandatory or discretionary notice, this Court first observes that the defendants have not demonstrated any prejudice as a result of the delay. Moreover, examining the applications for extensions, it was reasonable for the State judges to have concluded that the circumstances of the state, and later federal, investigations warranted postponement of the services.

In regard to the amendments *nunc pro tunc,* the defendants argue that suppression is appropriate for the following reasons: that Assistant United States Attorney Yanthis was an improper applicant under 18 U.S.C. § 2516; that, pursuant to 18 U.S.C. § 2516(1), Mr. Yanthis should have applied to a federal judge, and not to a state judge; that the applications were untimely under 18 U.S.C. § 2517(5) and CPL § 700.65(4); that there was no proper showing of probable cause to believe that the specified federal laws were being violated; and that the amendment of the Saratoga authorizations listed 339–1244 as the telephone number for Robert Lilla, rather than the correct number 399–1244.

■ Both objections resting upon 18 U.S.C. § 2516 are without merit. This provision of Title III addresses the situation of applicants who apply to federal judicial officers for *authorization to eavesdrop.* The relevant law is set forth in 18 U.S.C. § 2517(5) and CPL § 700.65(4). Title III provides:

> When an investigative or law enforcement officer . . . intercepts wire . . . communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom . . . may be used . . . when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

18 U.S.C. § 2517(5). As interpreted by federal courts, this provision authorized Assistant United States Attorney Yanthis, an "investigative or law enforcement officer," 18 U.S.C. § 2510(7), to apply to a state judge to obtain amendments *nunc pro tunc* of the state wiretaps at issue here. *See United States v. Marion,* 535 F.2d at 702 n.8, 704 & n.14, 706–08; *United States v. Tortorello,* 480 F.2d at 781–83; *United States v. Aloi,* 449 F.Supp. at 716. The State law counterpart to 18 U.S.C. § 2517(5) is CPL § 700.65, which reads:

> When a law enforcement officer . . . intercepts a communication which was not otherwise sought and which constitutes evidence of any crime that has been, is being or is about to be committed, the contents of such communications, and evidence derived therefrom, . . . . may be used . . . . when a justice amends the eavesdropping warrant to include such contents. The application for such amendment must be made by the applicant as soon as practicable. If the justice finds that such contents were otherwise intercepted in accordance with the provisions of this article, he may grant the application.

Inasmuch as Mr. Yanthis seems to qualify as a "law enforcement officer" under this provision, *see* CPL § 700.05(6), he was a proper applicant to apply for amendments of the eavesdropping warrants and extension orders.

As for the timeliness of the applications, 18 U.S.C. § 2517(5) and CPL § 700.-65(4) explicitly require that applications be made "as soon as practicable." The defendants claim that, at the latest, probable cause existed for the federal offenses at the expiration of the last warrant or extension in the mid-summer of 1980, and that federal and state law enforcement personnel thus delayed for almost eight months the applications for amendments. In its papers, the Government has explained that it was not until the tapes were unsealed and duplicated in March, 1981, that it determined conclusively the existence of probable cause. With respect to the state officers, there is nothing in the record to suggest that at the time of the interceptions, or even as late as February, 1981, the officers believed with certainty that probable cause existed to believe that federal offenses had been or were being committed. Given these circumstances, and the absence of any evidence that the law enforcement officers acted in bad faith, or that the defendants were unduly prejudiced by the delay, this argument of the defendants must be rejected.

Turning to the question of probable cause, there were ample reasons to believe that persons were violating 21 U.S.C. §§ 841 and 843 by using telephones to facilitate their distribution of cocaine. Additionally, the contents of the seized communications supplied probable cause to believe that the targeted figures were possessing cocaine, and conspiring or attempting to distribute the same, all in violation of 21 U.S.C. §§ 841, 844, and 846. The Court thus concludes that the amendments *nunc pro tunc* to include certain federal offenses were justified by probable cause.

In regard to the challenge to the representation of Robert Lilla's telephone listing, it is sufficient to note that Judge Brown was personally familiar with all the electronic surveillance conducted over Lilla's telephone. For this reason, this Court can confidently conclude that Judge Brown fully realized what he was authorizing in executing the amendment *nunc pro tunc.*

Finally, on oral argument, the defendants contended that prior to March, 1981, the tapes had been unsealed without judicial authorization. In support of this contention, the defendants claim that in his suppression hearing testimony on the issue of minimization, Agent Tripp stated that he had listened to taped conversations in January and February, 1981.

On cross-examination, Tripp had been asked a series of questions concerning *both* his *listening* of the tapes *and* his *review* of the log books. It was in response to the question "When . . . did you engage in *these activities*" that Agent Tripp answered: "I believe it was in the months of January, February, March and parts of April, 1981." Next, in reply to a question concerning the location of *"this physical activity"*, Agent Tripp stated: "I believe I did most of it . . . in the conference room of the United States Attorney's Office located in Albany, New York." Set in this context, it is apparent that Agent Tripp's answers were responsive to unclear and imprecise questions, and thus can be regarded as ambiguous. Accordingly, Agent Tripp's statements cannot be said to refute the clearly stated, sworn affirmations of the District Attorneys, in their March, 1981, applications for unsealing orders, that the tapes had remained sealed.

## II.

The defendants Michael Lilla and Frank Benson have moved to suppress certain statements which they made following their arrests. These statements, the defendants contend, were taken in violation of their rights under the Fifth and Sixth Amendments to the Constitution of the United States.

### A.

Certain general facts are common to the claims of both Lilla and Benson. On May

25, 1981, felony complaints were filed with this Court charging the two defendants with violating the laws concerning the unlawful use of communication facilities. Also on May 25, the United States Magistrate issued arrest warrants against Lilla and Benson, ordering that the defendants be brought before the nearest available federal Magistrate to "answer to" the complaints which had been lodged against them. These arrest warrants were executed the next day. While in custody on May 26, and before their arraignments that day, the defendants made certain statements to law enforcement personnel. On May 27, 1981, indictments against Lilla and Benson were filed by Assistant United States Attorney Yanthis.

The specific facts pertinent to the arguments of Michael Lilla are as follows. At 6:00 a. m. on May 26, 1981, New York State Police Investigator Harvey LaBar, accompanied by New York State Police Trooper Cheryl Monoco and three other State Police officers, arrived at Lilla's residence. Investigator LaBar and the others were admitted, and, once inside, LaBar arrested Lilla and advised him of his *Miranda* rights. According to the testimony of Investigator LaBar, Lilla stated that he understood his rights, and made no request for an attorney. Lilla testified, however, that after his arrest, he told his mother to contact attorney John Massaroni, who on previous occasions had given Lilla certain legal advice. Lilla stated further that he never expressly waived any of his *Miranda* rights before any of the New York State Police officers who had appeared at his residence that morning.

Following his arrest, Lilla was transported to the New York State Police Academy, where Agent Tripp was coordinating the arrests, processing, interviewing, and arraignments of twenty-one persons who had been arrested on federal charges that morning. At approximately 7:00 a. m., Agent Tripp met Lilla in a hallway area, advised Lilla of his *Miranda* rights, and asked Lilla if he had anything to say. Lilla responded "no", and then was escorted to an auditorium at the Academy where he was to await arraignment.

In the auditorium Lilla was guarded by Trooper Monoco, who was aware that Investigator LaBar had advised Lilla of his *Miranda* rights that morning. Off and on during the period from 9:00 a. m. until 11:00 or 11:30 a. m., Lilla and Trooper Monoco engaged in "small talk; " the record is unclear as to who initiated this conversation. Interspersing such conversation, however, were several questions asked by Trooper Monoco concerning Lilla's allegedly unlawful conduct. Trooper Monoco would ask a few questions, leave the room, and record both the questions and answers. At no time did Trooper Monoco threaten or coerce Lilla into making the statements. Also at no time did Trooper Monoco advise Lilla of his *Miranda* rights. Lilla neither informed Trooper Monoco that he was waiving any *Miranda* rights which he might have enjoyed, nor told her that he did not wish to speak with her or that he wanted to speak with an attorney. Additionally, Lilla testified that he was unaware that Trooper Monoco was taking a statement, and that he was under the impression that they were merely chatting.

It is this statement taken by Trooper Monoco, which Lilla has moved to suppress.

In this regard, John Massaroni, who represents the defendant Robert Lilla in this action, was not present at the hearing to determine the admissibility of Michael Lilla's statement. The Government has stipulated, however, that if Mr. Massaroni had been present, he would have stated the following. After his arrest and while he was still at his residence, Michael Lilla requested his mother to contact Mr. Massaroni, in the presence of five New York State Police officers. Subsequently, at approximately 6:45 a. m., Mr. Massaroni in fact received a telephone call from Lilla's mother. Immediately after receiving this call, at approximately 6:50 a. m., Mr. Massaroni telephoned New York State Police headquarters, Troop G, and was told by a Trooper that Lilla was being taken to the Academy. Mr. Massaroni stated to the trooper that he represented

Michael Lilla and his two brothers, and that no questions should be asked of any of the Lilla brothers. The Trooper responded: "That won't do you any good." Between 6:55 a. m. and 7:00 a. m., Mr. Massaroni telephoned the Academy. He spoke to a desk sergeant, telling the officer that he represented all three Lillas, and that no questions should be asked of any of his clients. The desk sergeant replied: "I will not relay any messages for you." Thereafter, at 7:56 a. m., Mr. Massaroni surrendered Mark Lilla to the custody of two New York State Police officers who had been stationed in a car in front of Unified Auto. Mr. Massaroni asked the officers not to question Mark Lilla, and stated to the officers that he represented all three Lilla brothers, that he was going to the Academy, and that there was to be no questioning of Michael and Robert Lilla. At 9:00 a. m. Mr. Massaroni arrived at the Academy, and spoke to the desk sergeant whom he had earlier reached by telephone. Mr. Massaroni repeated his earlier admonishment to the sergeant, and requested to see immediately the three Lillas. Rather than being taken to the Lilla brothers, Mr. Massaroni was asked to be seated. While seated, Mr. Massaroni saw Agent Tripp, whom he recognized. He told Agent Tripp that he represented the three Lilla brothers, and asked Tripp not to question any of his clients. In response, Agent Tripp said that Mr. Massaroni would have to be seated, and that he would see the Lillas later. One or two hours later, Mr. Massaroni met with Robert, Michael and Mark Lilla.

These facts pertain to the claims of the defendant Frank Benson. At 6:20 a. m. on May 26, 1981, Frank Benson, who is twenty-six years old, was arrested by several New York State Police officers while he was on his way to work. The officers transported Benson back to his residence, where, at approximately 6:45 a. m. or 7:00 a. m., they advised Benson of his *Miranda* rights. During this time, Benson's younger brother, Donald Benson, was arrested and carried to Frank Benson's residence. Following his brother's arrival, at approximately 7:00 a. m. or 7:15 a. m., and in the presence of law enforcement officers, Frank Benson telephoned attorney Jerome Frost, who had represented him in a previous criminal proceeding. The Court notes here that Mr. Frost represented both Frank and Donald Benson at the suppression hearing to determine the admissibility of statements made by Frank Benson. Unable to reach Mr. Frost, Frank Benson placed a telephone call to a gentleman who worked as a truck mechanic in Benson's refuse business. Benson told the gentleman to contact Mr. Frost on behalf of himself and his brother.

At approximately 8:00 a. m., Frank Benson and his brother were transported to the Academy, where they arrived at around 8:30 a. m. Until 9:00 a. m. or 9:15 a. m., the Benson brothers, along with other persons, were searched, photographed, finger printed, and otherwise "booked." Frank Benson and his brother were then separated. Frank Benson was taken to an interview room, where he was met by Agent Tripp and Investigator Girtler; two other State Police personnel were also present in the room, but remained in the background. Benson was advised of his *Miranda* rights, and at 9:25 a. m. Benson signed a "waiver of rights" form. He subsequently made an oral statement, which, in some form, was taken down in shorthand and then typed. This entire process ended between 11:00 a. m. and 11:30 a. m.

The specific circumstances surrounding the interview are the subject of much dispute.

At the hearing, Agent Tripp testified that Frank Benson was brought into the interview room once on the morning of May 26, 1981, in the vicinity of 9:00 a. m. or 9:10 a. m. This testimony, however, was also presented by Agent Tripp:

Q: Okay. Now, what was the point in time when Mr. Benson arrived in that room?

A: In the interview room?

Q: Yes, what time of day was it, approximately?

A: The first time that he was brought into the interview room?

Q: He was brought in there on more than one occasion?

A: No, he wasn't.

Tripp stated further that at that time, he was not aware that Benson was represented by an attorney, and that Benson appeared cooperative, but nervous and upset about his arrest, and concerned about his younger brother. Following the execution of the waiver of rights form, Agent Tripp averred, Benson, Investigator Girtler, and he discussed for approximately twenty minutes, or until 9:45 a. m., Benson's involvement in the charged offenses. According to Tripp, a stenographer was then brought into the room. For close to forty minutes, or until 10:30 a. m., Tripp said, the stenographer recorded Benson's answers to questions posed by Agent Tripp and Investigator Girtler.

Agent Tripp stated next that it was not until the stenographer had left the room to type the statement that he learned that Mr. Frost had arrived at the Academy representing himself to be Benson's attorney. During the interview process, Tripp said, Benson never indicated that Mr. Frost was his attorney. Agent Tripp testified that at approximately 11:00 a. m. he spoke to Mr. Frost, telling Mr. Frost that Benson was being "processed", or booked, photographed, etc., that Benson had said that Mr. Frost was not his attorney, and that Benson had indicated that he did not want to talk to Mr. Frost. Thereafter, in the vicinity of 11:15 a. m., Tripp stated, Mr. Frost was allowed to meet with Benson. Benson, Agent Tripp averred, told Mr. Frost that he had not called him, that he had not retained him, and that he did not want to talk to him. At approximately 11:30 a. m., Agent Tripp said, Investigator Girtler appeared with the typed statement, and asked Mr. Frost to leave the room. Benson, Tripp stated, was then asked if he still wished to sign the statement, and Benson responded "yes." Following the signing of the typed statement, Agent Tripp said, Benson was permitted to speak again with Mr. Frost.

Agent Tripp testified further that during the questioning, Benson was informed that it would be beneficial to him and his brother if he would cooperate; that his cooperation would be made known to the United States Attorney's office and to the Court; that the United States Attorney's office might consider his cooperation towards his brother's case; that the United States Attorney's office might request a lower bail for him and his brother if he cooperated; that his cooperation would not hurt his brother's case; that there was a possibility that he would get probation if he cooperated; and that he and his brother might be able to go home that morning and finish their work. Additionally, Tripp stated that he identified himself to Benson as the person in charge of the drug investigation and raid on behalf of the Government. Agent Tripp denied that anyone made a commitment to Benson on the part of the Government concerning the dropping of charges against Donald Benson in exchange for Frank Benson's cooperation, and denied saying that Benson would not need an attorney if he cooperated; that an attorney would complicate matters, "mess things up", and cost him money; that the Government had an open and shut case against Benson; that Benson and his brother would go to prison where conditions would not be pleasant; that Benson would lose his business; or that Benson could wait until the next day to produce bail money.

Investigator Girtler also appeared at the hearing. It was his testimony that Frank Benson was brought to the interview room because he wanted to talk to law enforcement personnel. Moreover, according to Girtler, Benson never mentioned that he wanted to see an attorney, and that, when Benson and Mr. Frost were conversing just before Benson signed the typed statement, Benson looked up at Tripp and him and said: "I don't know what he is doing here. I don't want him here. I didn't call him here. He doesn't know anything about this. He will wind up getting me killed." Girtler stated further that no threats or promises were made to Benson, and denied that anyone told Benson that he would lose his business, and that he and his brother were going to jail. Investigator Girtler remem-

bered also, however, that Benson had asked if he might have to go to jail, and that the response was that it was a possibility. Additionally, Girtler recalled that Benson had been "very" concerned about his brother. Finally, Investigator Girtler testified that although he could not recall whether Agent Tripp had indicated that the case against Donald Benson would go lightly or that Frank Benson would receive probation, or whether Tripp had stated that he would recommend probation, he did remember that Agent Tripp had told Benson that his brother's case was independent of his case.

Frank Benson testified at the hearing that after he and his brother had been "booked," he was taken to a hallway area, and then ushered into a room where Agent Tripp, Investigator Girtler, and two other State Police officers were present. Benson stated that he was in this room for approximately ten minutes, during which time he informed Agent Tripp and Investigator Girtler that he had an attorney who was on the way to the Academy. Then, Benson related, he left the room and returned to the hallway, where he remained for approximately fifteen minutes. While in the hallway, Benson said, he told a Trooper standing next to him that his attorney was coming, and asked the Trooper to "keep an eye out for him" because he wanted to see his attorney as soon as he arrived. The Trooper, according to Benson, agreed to do what Benson had requested, and also told Benson that an attorney had telephoned to report that he was on his way to the Academy.

Following this exchange in the hallway, Benson testified, he was taken back into the room, whereupon he told Tripp and Girtler that his attorney was *en route*, and that he had no statement to make. In response to his remarks, and before he signed anything, Benson stated, Agent Tripp and Investigator Girtler told him that an attorney would do him no good; that he had no chance; that they had an open and shut case against him; that he and his brother would go to prison where they would be sexually abused; that he would lose the business for which he worked very hard; and that the only alternative was for him to cooperate

with them. Benson continued by stating that he was very upset, and that the two interviewers made him certain offers, to the effect that if he cooperated, he would get probation, charges against his brother would be dropped, bail would be low for both of them, and that after giving a statement, he and his brother could leave, go to work, and return the next day to produce bail.

Following these representations, Benson testified, there was a knock at the door, and someone spoke with Tripp, telling him that an attorney for Frank Benson was in the building. When he overheard this comment, Benson stated, he asked Agent Tripp to "please go talk to [his] attorney", and told Tripp that he "wanted to see [his] attorney." According to Benson, Agent Tripp left, and later returned, saying that he could not find Mr. Frost.

On the question of his execution of the waiver of rights form, Benson averred that he felt he had to sign the form because he believed that he was going to prison, and that there was no alternative. Furthermore, he related that although he had an opportunity to read the form, he did not read it. Benson stated also, however, that the form was explained to him.

In regard to the circumstances surrounding the actual questioning, Benson testified that he made a number of requests for his attorney, but that the responses to his requests were that an attorney would cost a great deal of money. Benson also averred that the stenographer did not take down verbatim his answers to the questions posed by Agent Tripp and Investigator Girtler, and that, instead, the stenographer recorded paraphrases of his answers which were given to her by the two officers. Benson noted, however, that the recorded answers were not factually inaccurate. Finally, Benson testified that it was not until after he had signed the typed statement that he saw Mr. Frost for the first time that day.

Donald Benson also appeared as a witness at the hearing. He testified that while he was in the auditorium at the Academy, he

heard his brother's name being called during the arraignments before the Magistrate, but that his brother was not present. Donald Benson said that he saw Mr. Frost go to the front of the auditorium, and tell the Magistrate that he wanted to see his client Frank Benson. Next, Benson related, he saw Agent Tripp speak with Mr. Frost, and overheard Agent Tripp tell Mr. Frost that Frank Benson was being processed.

It is the written and oral statements made to Agent Tripp and Investigator Girtler that Frank Benson seeks to suppress.

### B.

At the outset, it is necessary to consider what, if any, constitutional rights were implicated by the circumstances surrounding the custodial confinement of these defendants.

Certainly the defendants' rights under the Fifth Amendment, and under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were triggered by the questioning of law enforcement personnel following their arrests. In the case of Michael Lilla, although the record is unclear as to who initiated the casual conversation, the record quite plainly establishes that Trooper Monaco elicited answers to specific questions which, at a minimum, she should have known were reasonably likely to evoke self-incriminating responses. The record also indicates that Michael Lilla did not spontaneously volunteer the incriminating information. These circumstances suggest that Michael Lilla was subjected to custodial interrogation, and thus entitled to certain constitutionally mandated protections. *See Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981); *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 1875, 68 L.Ed.2d 359 (1981); *Rhode Island v. Innis*, 446 U.S. 291, 298, 300–01, 100 S.Ct. 1682, 1688, 1689–90, 64 L.Ed.2d 297 (1980); *Miranda v. Arizona*, 384 U.S. at 444, 469, 86 S.Ct. at 1612, 1625. Frank Benson was also deliberately and expressly questioned by law enforcement personnel, and, as with Michael Lilla, there is no evidence that his incriminating statements were purely gra-

tuitous remarks. This defendant, then, was not merely taken into custody, but instead was subjected to interrogation. *See Rhode Island v. Innis*, 446 U.S. at 300, 100 S.Ct. at 1689.

■ Because each defendant was interrogated while in custody, all statements made by them must be suppressed unless the Government establishes, *inter alia*, that the defendants knowingly, voluntarily, and intelligently waived their rights under *Miranda*. *See Miranda v. Arizona*, 384 U.S. at 475, 86 S.Ct. at 1628; *White v. Finkbeiner*, 570 F.2d 194, 200–01 (7th Cir. 1978). On the question of waiver, where a defendant has invoked his right to counsel, the Government must demonstrate that his right was voluntarily, knowingly, and intelligently relinquished or abandoned, and that, when invoked, all questions ceased until counsel was made available to the defendant or until the defendant initiated further communications. *See Edwards v. Arizona*, 101 S.Ct. at 1883–85; *United States v. Gordon*, 655 F.2d 478, 485 (2d Cir. 1981).

■ Applying these standards to the facts before the Court, it appears that Michael Lilla specifically exercised his right to counsel by requesting his mother to reach his attorney by telephone. *See Id.* at 486. Moreover, Lilla's refusal to respond to questioning by Agent Tripp, coupled with the circumstances surrounding the conversation in the auditorium, indicate that Lilla neither initiated further purposeful communications with law enforcement officers nor knowingly or intentionally abandoned his right to counsel. In view of all these factors, *see Fare v. Michael C.*, 442 U.S. 707, 724, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197 (1979); *North Carolina v. Butler*, 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286 (1979), the Court is not persuaded that the statement of Michael Lilla comports with the strictures of the Fifth Amendment.

■ Because of the conflicting testimony presented at the hearing, the situation of Frank Benson presents a more difficult matter for resolution. The record is undis-

puted that at his residence, and in the presence of law enforcement officers, Benson explicitly invoked his right to counsel by attempting to contact his attorney directly, and by arranging for his mechanic to reach his attorney. This invocation should have been communicated by the arresting officers to Agent Tripp. *See White v. Finkbeiner*, 611 F.2d 186, 193 & n.20 (7th Cir. 1979). In this regard, if Benson indeed expressed an initial desire at the Academy to speak to Agent Tripp and Investigator Girtler, the Government has failed to carry its heavy burden of demonstrating that Benson intelligently relinquished his right to counsel. The uncontroverted evidence adduced at the hearing portrays Benson as being greatly distressed about the arrest of his brother. Given such evidence, this Court believes that the representations attested to by Agent Tripp tended to have the cumulative effect of prompting Benson to decide, without "carefu[l] consider[ation]", *United States v. Gordon*, 655 F.2d at 486, to proceed without counsel. *See United States v. Tingle*, 658 F.2d 1332, 1335–36 & n.4 (9th Cir. 1981). *See also Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976); *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). In reaching this conclusion, the Court is not rejecting the defendant's testimony concerning the circumstances surrounding his questioning. Indeed, this Court found the defendant to be a very credible witness. The Court has decided, however, that the facts presented by the Government support a finding that the defendant's rights under the Fifth Amendment were violated. It thus becomes unnecessary to resolve the more unsettling question of whether the investigating law enforcement officers refused to honor Benson's request to confer with his attorney.

### C.

Even if the statements of Michael Lilla and Frank Benson were admissible under the Fifth Amendment, they would be patently inadmissible under the Sixth Amendment.

■ The general rule in this Circuit is that the filing of a felony complaint ordinarily does not give rise to a right of counsel secured by the Sixth Amendment. *See United States v. Duvall*, 537 F.2d 15, 22 (2d Cir.), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). *But see United States v. Miller*, 432 F.Supp. 382, 387 (E.D.N.Y.1977), *aff'd without published opinion sub nom. United States v. Fernandez*, 573 F.2d 1297 (2d Cir. 1978). *Cf: People v. Samuels*, 49 N.Y.2d 218, 400 N.E.2d 1344, 424 N.Y.S.2d 892 (1980). Here, however, it is apparent that the law enforcement process had shifted from investigatory to accusatory, in the sense that both defendants seemed to have been the focus of federal grand jury proceedings during the months preceding their arrests and were otherwise the specific focus of substantial prosecution activities. Along with the intent of officers to subject the defendants to interrogation and to thereby elicit statements concerning the offenses charged in the felony complaints, this shift in law enforcement activities triggered the defendants' right to counsel under the Sixth Amendment. *See Kirby v. Illinois*, 406 U.S. 682, 689–90, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972); *Escobedo v. Illinois*, 378 U.S. 478, 485, 490–92, 84 S.Ct. 1758, 1762, 1764–65, 12 L.Ed.2d 977 (1964); *United States v. Garcia*, 377 F.2d 321, 324 (2d Cir.), *cert. denied*, 389 U.S. 991, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967). *See also Rhode Island v. Innis*, 446 U.S. at 300 n.4, 100 S.Ct. at 1689 n.4. To hold otherwise under these circumstances "would exalt form over substance." *Escobedo v. Illinois*, 378 U.S. at 486, 84 S.Ct. at 1762.

■ A defendant of course may waive his right to counsel. Waivers under the Sixth Amendment, however, have traditionally been governed by a standard higher than have waivers under the Fifth Amendment. *See, e.g., United States v. Mohabir*, 624 F.2d 1140, 1146 (2d Cir. 1980); *Carvey v. LeFevre*, 611 F.2d 19, 21, 22 (2d Cir. 1979), *cert. denied*, 446 U.S. 921, 100 S.Ct. 1858, 64 L.Ed.2d 276 (1980); *United States v. Satterfield*, 558 F.2d 655, 657 (2d Cir.

1976). *Cf: Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (applying Sixth Amendment standard to waiver under Fifth Amendment). The Government must establish not only that the defendant knowingly, voluntarily and intelligently waived his right to counsel, but also that the defendant comprehended and intentionally relinquished or abandoned this right. *See, e.g., Estelle v. Smith*, 101 S.Ct. at 1877 & n.16; *United States v. Mohabir*, 624 F.2d at 1147; *Carvey v. LeFevre*, 611 F.2d at 21. On this point, a waiver " 'requires the clearest and most explicit explanation and understanding of what is being given up.' " *Carvey v. LeFevre*, 611 F.2d at 22 n.1 (citation omitted). For this reason, the mere provision of *Miranda* warnings may not suffice to call the defendant's attention to the enormity of his contemplated decision. *See United States v. Mohabir*, 624 F.2d at 1148–51; *United States v. Miller*, 432 F.Supp. at 388.

■ In the cases of both Michael Lilla and Frank Benson, officers appear to have only apprised the defendants of their rights under *Miranda*. There is no evidence that anyone explained to Lilla and Benson "the dangers and disadvantages of self-representation", *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975), or in any other respect elaborated the importance of representation by legal counsel. For these reasons, the Government has not proven that the defendants competently waived their right to counsel. The statements of the defendants were hence taken in violation of the Sixth Amendment.

Separate grounds also exist to hold the statements inadmissible under the Sixth Amendment.

■ With respect to Michael Lilla, this Court cannot understand why Mr. Massaroni was denied immediate access to his client. Such a denial flagrantly contravened the defendant's right to counsel. *See, e.g., Miranda v. Arizona*, 384 U.S. at 465–66 n.35, 86 S.Ct. at 1623 n.35 (citing *People v. Donovan*, 13 N.Y.2d 148, 193 N.E.2d 628, 243 N.Y.S.2d 841 (1963)). Addi-

tionally, where an attorney states that an accused has sought his assistance, and requests that no one question his client until he has conferred with him, this request should be communicated to law enforcement personnel responsible for the continued custody of the accused, and should be honored accordingly. *See also United States ex rel. Magoon v. Reincke*, 416 F.2d 69, 70 (2d Cir. 1969). Here, Mr. Massaroni, following an indirect communication from his client, did everything he reasonably could have done to communicate his desire that Michael Lilla not be interrogated. This communication ought not to have fallen on deaf ears.

■ As for the situation of Frank Benson, the law enforcement officers, at a minimum, acted improperly in misrepresenting to Mr. Frost that the defendant was being "processed." Such an intentionally erroneous representation to an attorney professing that he represents an accused, calls into question the good faith efforts of law enforcement personnel to respect a defendant's Sixth Amendment right to counsel.

### III.

Accordingly, this Court concludes that the motions by the defendants to suppress the evidence derived from electronic surveillance must be denied, and that the motions by the defendants Michael Lilla and Frank Benson to suppress their confessions, or admissions, are granted.

IT IS SO ORDERED.